**ELECTRI–FLEX COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 77–1515.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1977.

Decided Feb. 14, 1978.

Rehearing Denied March 16, 1978.

---

Samuel W. Witwer, Jr., R. Dennis Claessens, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, William R. Stewart, Arnold Podgorsky, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before TONE and WOOD, Circuit Judges, and WYZANSKI, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Electri-Flex Company (hereinafter referred to as the company) petitions this court, pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.,* to review a Decision and Order of the National Labor Relations Board. The Board has filed a cross-application for enforcement of its order.[1]

The company contends there is not substantial evidence to support the Board's finding that the company interfered with or restrained the employees in their unionization efforts or that the company improperly discharged and transferred pro-union em-

---

* The Hon. Charles E. Wyzanski, Jr., Senior District Judge of the District of Massachusetts, is sitting by designation.

1. The Board's Order was issued on March 17, 1977 and is reported at 228 NLRB No. 79.

ployees. In addition, the company seeks review of the violations found in respect to its use of a written warning system, and the implementation of tentatively approved contract provisions, a call-in rule and a 60-day probationary provision.

## A.

### *The Interference Charge*

The company contends the record lacks the substantial evidence necessary to support the Board's findings that it interfered with, restrained, and coerced its employees in the exercise of their statutory rights and thus violated Section 8(a)(1) of the Act.

■ In applying the "substantial evidence" standard we are aware of our duty to examine the entire record, including the evidence opposed to the Board's view, to determine whether the record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion" and to find that the decision is "justified by the fair estimate of the worth of the testimony of the witnesses or its informed judgments on matters within its special competence." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–90, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1957).

■ The testimony before the Administrative Law Judge (hereinafter referred to as ALJ) revealed that there had been interrogation by the company of its employees in regard to their union activity, and that discharge and other forms of reprisals were threatened if the employees supported the union or signed the authorization cards. In addition, the company promised to place those who voted for the company in management positions in an effort to dissuade employees from supporting the union. Other testimony revealed that the company maintained lists of employees on the basis of pro or anti-unionism, creating the impression that it had its employees under surveillance. We find there is substantial evidence to support the Board's finding of a violation of Section 8(a)(1).

The company also objects, claiming the ALJ used an "unnatural and legally unsupported test" relying solely on the absence of specific denials by the supervisors who engaged in the violative conduct.

■ The Board found that the ALJ even though not making explicit credibility findings, implicitly resolved conflicts in the testimony "by accepting and relying on the testimony of the General Counsel's witnesses," and in addition that the findings were based on demeanor. We agree with the conclusion reached by the Board that "there is no basis to overturn the . . . evaluation of credibility based on demeanor and the record as a whole. . . ." See *NLRB v. Braswell Motor Freight Lines,* 486 F.2d 743, 745 (7th Cir. 1973).

## B.

### *The Discharge and Transfer Violations*

The Board found that the company violated Section 8(a)(3) in its actions involving employees, Adrian Velez, Martin Ibarra, Juan Martin and Tony Capasso and additionally violated Section 8(a)(4) as to Tony Capasso.

■ The controlling principle behind the finding of a Section 8(a)(3) violation is that the company's action or decision was discriminatorily motivated. *NLRB v. National Food Stores, Inc.,* 332 F.2d 249, 252 (7th Cir. 1964). In determining this motivation, the Board may consider circumstantial as well as direct evidence. Further, while it is necessary for this court to determine whether there is substantial evidence on the record as a whole to support the decision of the Board, the decision is entitled to judicial affirmance, "even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 465.

■ Finally, we note that absent exceptional circumstances, credibility resolutions

are within the province of the trier of fact. *Sarkes Tarzian, Inc. v. NLRB,* 374 F.2d 734, 736 (7th Cir. 1967).

Below we give a brief review of the circumstances surrounding these incidents.

The records show that Adrian Velez's transfer from the position of set-up man to packager occurred within days of interrogation by company supervisor regarding his union sentiments and his admission that he had signed a union card. The company's statements and treatment of Velez following this July 16 transfer also indicate that the company was attempting to get rid of him prior to the union election, because they viewed him as a union sympathizer and activist.

As to Martin Ibarra, the record shows that his transfer from set-up man to machine operator occurred on the very same day he was observed distributing union handbills. The ALJ indicated he was not crediting the testimony of the company's representative, that Ibarra had been transferred because of dissatisfaction with his work.

Juan Martin had been employed by the company since 1971. He became active in the unionization efforts at the company, signed an authorization card, attended meetings and distributed handbills on the day of the election. The company was aware of his union activity. Martin was fired by the company on January 28 after a disputed incident involving another employee. The ALJ indicated he was crediting the employee's version, which indicated that the incident was merely an "insignificant bumping" rather than a fight and found that the company magnified this minor incident to enable it to rid itself of a pro-union adherent.

Tony Capasso was known by the company to be a union supporter, having been questioned about it by his supervisor, and was told that things would be made rough for union supporters. In October, Capasso was confronted with the information that the company was aware that he had made a complaint to the Board and was told by foreman Brilz that he could have his job if he wanted it. Later there was an incident involving an infraction of the company rule to wear safety shoes, where Capasso was given a 3-day suspension in comparison to only one day given another employee for the same violation on the same day. The company claimed a "threat" was made by Capasso at this time and that this was the cause for his termination two days later. The ALJ specifically credited the testimony of Capasso over that of the company representative, Colosi, finding that the discharge had not occurred as Colosi testified and that it was Capasso's union activity which had caused the company to terminate him.

■ Applying the principles given above to the facts of this case, we feel there is substantial evidence in the record to support the finding of the board that a discriminatory motive prompted the company's decision to transfer Adrian Velez, to transfer Martin Ibarra, to discharge Juan Martin, and to discharge Tony Capasso. Further, the fact that Tony Capasso had given information to the National Labor Relations Board was an additional motive prompting his discharge, thus violating Section 8(a)(4).

## C.

### The Written Warning System

The written warning system[2] was found to be a new disciplinary system in that it amounted to a significant change from the previous system, that it had been implemented without bargaining with the Union and therefore was a violation of Sections 8(a)(5) and (1) of the Act. The Board, in addition, found that the record supported a

---

**2.** Pursuant to the written warning notice-disciplinary system, for a first offense, an employee would receive a verbal warning; for a second offense, an employee would receive a written warning; for a third offense, an employee would receive a written warning and 3-day suspension; and for a fourth offense, an employee would be discharged.

finding that the system was implemented with the illegal motivation of harassing and retaliating against union supporters and sympathizers, and therefore also violated Section 8(a)(3) of the Act.

■ In objecting the company presents three arguments. First, it is contended that a company's mode of discipline is not a mandatory subject for bargaining and rather is within the area of "management prerogative." *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). While it is true that the Act does not take from the employer the right to enforce reasonable rules for the conduct of the business and to take disciplinary action against employees who either violate the rules or are generally not suitable for efficient production, *NLRB v. Mylan-Sparta Co.,* 166 F.2d 485 (6th Cir. 1948), it is equally true that the institution of a new system of discipline is a significant change in working conditions, and thus is one of the mandatory subjects for bargaining under the provisions of Section 8(d) of the Act, included within the phrase "other terms and conditions of employment." *NLRB v. Amoco Chemicals Corp.,* 529 F.2d 427, 431 (5th Cir. 1976); *NLRB v. Gulf Power Co.,* 384 F.2d 822, 823 (5th Cir. 1967).

Thus it is necessary to determine if there was evidence to support the finding by the Board that the written notice system was a new system of discipline, or a significant change from the previously existing system. The company admits there was an increase in the numbers of written warnings issued after the arrival of the union, but states that the record does not support the conclusion that this was a change in kind, rather that it was only a change in quantity.

The record reveals, however, that before the election the company primarily disciplined its employees verbally, and only occasionally issued written warning notices. This conclusion is supported by the evidence that from January, 1972 [3] until the arrival of the union a total of thirteen warning slips had been issued by the company, primarily relating to safety violations.[4] In the period following the election until the time of the hearing, April 1976, a period of only nine months, there was a total of 147 warning slips issued. A review of these written warning slips reveals that while there was an increase in notices for safety violations, there was as well a marked increase in the number issued for such reasons as "bad attitude," "poor production," "failure to follow instructions," and "talking." [5]

■ We find that both the sudden increase in the sheer number of notices issued as well as the increase in those issued for what can generally be called non-safety violations, provide sufficient basis for the Board's conclusion that the written warning system was in effect a "new" disciplinary system and a significant change in working conditions which had been implemented prior to bargaining with the union and was thus a violation of Section 8(a)(5).

■ The company's second argument, waiver by inaction, is based on the allegation that the union made no objections to the use of these warning notices during the five weeks between the election and a meeting held on September 18th, where this

---

**3.** In their reply brief the company objects to January, 1972 as the beginning reference date for the use of the warning tickets, claiming it did not commence use of this until approximately January, 1973. However, the record reveals (Tr. 995–96) that it was company's counsel who designated January, 1972 as the reference point. Even if January, 1973 were to be used, we can perceive of no different result.

**4.** Of the thirteen, nine were for safety violations. A review of the company's chart on

pages 23–25 of their brief shows that the last pre-union warning notice was issued in February, 1975. There were no warnings issued again until July, 1975 (G.C.Ex. 128), when the unionization efforts were well under way. This July warning is not included as one of the pre-union or post-union notices.

**5.** See also Section D, *infra,* and the use of warning notices for violation of the call-in rule.

matter was discussed. It is unnecessary under the facts here for this court to define the circumstances where inaction constitutes waiver, for here the facts do not support a finding of inaction. There is nothing in the record to indicate that the union had been made aware of the use of this system during this five-week period. The company points only to the fact that it was in use and it had not tried to hide this use to show therefore that the union knew and acquiesced by not saying anything. The only testimony as to the union's knowledge was that of employee Marrero who stated he notified the union of the use of warning tickets around September 16, when he received his second such notice within five days. The union then contacted the company and a meeting was arranged to discuss the matter on September 18. After this meeting the company continued in its use of the notices and charges were filed on October 1, 1975. These facts do not support a theory of inaction.[6]

■ The company also contends that the union expressly agreed to the use of written notices as a disciplinary system at the meeting which took place on September 18, and therefore waived its right to object later. The union representatives, however, testified that they were told by the company representative at this meeting that the warning slips were not being used for disciplinary reasons, but only as a corrective measure. The ALJ specifically indicated that he was crediting the testimony of the union agents, Haderly and Menendez, over that of the company representative, and that there was no other evidence which would support a finding that the union had agreed to the use of this system, as a disciplinary system. We are not presented here with any exceptional circumstances which would warrant departure from the rule that

"the Board's action in crediting or discrediting witnesses will not ordinarily be disturbed on review." *Sarkes Tarzian, Inc. v. NLRB, supra.*

■ As to the Board's additional finding that the system also violated Section 8(a)(3), the company objects on the basis that the Board failed to find on an "incident-by-incident basis" that illegal motivation was behind the issuance of each notice. Further, that the system could not be said to be a retaliatory system, since its overall effect was an improvement or a moderation of the pre-union situation, which was characterized by termination for infractions of the company rules. However, having examined the record as a whole, we are convinced that the Board was correct in finding that the disciplinary system also violated Section 8(a)(3).

First, it was alleged in the amended complaint that the system was instituted because of union activity. We also note that the Board's finding of an additional violation did not contradict the fact findings of the ALJ, who found that certain uses of the warning notices were illegally motivated. Prior to the union election, the company made threats to its employees that it would make it "rough" on union sympathizers and that "things would be different" if the union came. Within days of the union election, the company began uniformly imposing a system of written notice with no prior notification to the employees that all infractions of the company rules now would be enforced with this system.

The company's motive in instituting the system was revealed in its statements to employees upon receiving a warning notice, namely, that it was because of the presence of the union that the notices were necessary.[7] The company's explanation was that it was necessary to improve its system and

---

**6.** The company contends that the union's subsequent contract proposal which was accepted by the company reveals that the union sanctioned the use of written warning notices as a disciplinary system. However, we fail to see how a subsequent agreement can show union approval that the system be unilaterally imposed before the provision was even proposed.

As discussed *infra,* Section D, even if there had been tentative approval for the use of the system, this would not have allowed the company to put the system into effect prior to ratification of the entire contract by the employees.

**7.** For example, when Rivera received a warning notice for failure to call in, he was told "[Y]ou

assure more accurate record keeping, since it expected "new experiences, in terms of grievances, arbitrations and perhaps even NLRB charges." As the Board noted, inherent in this explanation is the idea that it was the presence of the union which made the system necessary.

In addition to the increase in the notices issued and the statements made to employees, there was the testimony concerning a conversation between supervisors Colosi and Bonner which was overheard by one of the employees. During this conversation, Colosi told Bonner that if the company could get rid of the union people and replace them with employees who would support the company, it could overthrow the union. Bonner replied: "You can't just go around and fire union people; you have to give them warning slips or the Union will just get them their jobs back."

The company's claim that it was impossible for the Board to find an "illegal motive" since some of the tickets may have been warranted, misses the point. It is motivation, not justification, which determines the existence *vel non* of discriminatory motive. While disciplinary action may have been warranted in some instances this does nothing to refute the charge made by the union and the finding of the Board that the system as a whole was implemented for a retaliatory purpose, and was being used as a way of harassing and justifying dismissal of union sympathizers. We find there is substantial evidence to support the finding of a Section 8(a)(3) violation in the implementation of the warning system.

### D.

### *The Call-In Rule*

The company also objects to the finding by the Board that the company's call-in rule, which required employees to report by a specified time if they were going to be absent, violated Section 8(a)(5).

First, it is necessary to address the company's claim that the Board was precluded from finding this violation because it had not been alleged in the complaint. As the Board noted when this argument was addressed to them, one of the charges in the complaint was that the company had committed conduct violative of Section 8(a)(5) and this allegation was sufficient to provide notice. Also, and most importantly, the facts pertaining to the call-in rule were litigated at the hearing and the ALJ made findings of fact in regard to the rule.[8] This court has held that "even where a complaint is devoid of notice of the unfair labor practice found, due process is satisfied where there has been full litigation of the issues." *NLRB v. Duncan Foundry and Machine Works, Inc.*, 435 F.2d 612, 615 (7th Cir. 1970).[9]

The company argued that a 9 a. m. call-in rule was a plant rule which had always been in force and that by instituting the tentatively approved 11 a. m. call-in rule, it was merely attempting to improve its system in accordance with union demands on which agreement had already been reached at the bargaining table.

The pre-union work rules presented to the ALJ reveal that the Spanish translation[10] of the section pertaining to the call-in rule did not specify any particular time as the deadline for calling in.

Employees testified that they were not aware of a time limit in connection with the call-in rule, nor had it ever been applied to

---

guys brought the union here, that's what you get for bringing in the union." (Tr. 133–34).

**8.** The ALJ did not find the rule to be a violation of the Act. However, the finding by the Board was not inconsistent with the facts as found by the ALJ.

**9.** The company made this same argument as to the violation found in connection with the pro-

bationary provision discussed in Section E, *infra*. We reach the same conclusion as to that provision.

**10.** The importance of this fact is that approximately three-fourths of all the employees at the company are Spanish-speaking many of them speaking no English at all.

them until after the arrival of the union.[11] Mr. Kinander, who testified for the company, admitted that prior to the election the rule had been enforced inconsistently. The records submitted by the company to support its position of the pre-existence of the rule, reveal that while disciplinary action was taken due to "no call" prior to the election, not only is there no mention of any specific time, but in all instances cited there had been the total absence of any call by the employee, usually involving a period of days. However, starting with the warning notice issued on September 30, 1975, there was detailed reference to the fact that the company required a 9 a. m. call-in time.

The company contends that it has been placed on the horns of a dilemma, since if it had remained with its older, stricter method of enforcement of the rule, termination, it could have been found in violation of the Act, and that by attempting to institute a liberalization of the rule, it has also been found in violation of the Act. However, this very appealing representation of the company's position is a misrepresentation of the objections of the General Counsel and the finding of the Board. While the General Counsel was objecting to the implementation of the tentatively approved "11 a. m. provision," it was not because it was a liberalization of an already existing rule, but because the call-in rule did not exist, as it was now being applied, prior to the union election. Thus, the General Counsel argued and the Board agreed, the implementation of the 11 a. m. rule, even though it had been tentatively approved, was an unlawful unilateral change in employment conditions violative of Section 8(a)(5).

Next the company argues that it cannot be said that it has "failed to bargain," which is the essence of a Section 8(a)(5) charge, since tentative agreement had been reached. This situation is not covered by the rule announced in *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), according to the company, since the provision is no longer "under discussion." Rather, the company urges since it was no longer free to withdraw from and repudiate already approved provisions under the teachings of *American Seating Co. v. NLRB*, 424 F.2d 106, 108 (5th Cir. 1970), and *San Antonio Machine and Supply Corp. v. NLRB*, 363 F.2d 633, 636–37 (5th Cir. 1966), and would have been free to implement change which had been rejected by the union, even though no impasse had been reached, under the teaching of *NLRB v. Bradley Washfountain Co.*, 192 F.2d 144 (7th Cir. 1951), that it is obviously not an unfair labor practice to implement provisions on which tentatively agreement has been reached between the union and the company.

We express no opinion as to what the result might have been had the parties been silent as to the time and method of implementation for the tentative provisions, and the employees had been notified prior to the implementation of the changes, but that is not the situation here.

The union representative, Mr. Haderly, testified that prior to and at all times during negotiations, the position of the union, which had been stated to the company, was that no agreement reached during negotiations was effective until ratified by the employees. The evidence shows that the employees had not been informed of the implementation of the call-in rule, and only learned of its existence through violation of the rule. Accordingly, we find that because there had been no agreement nor understanding that tentatively approved proposals were to go into immediate effect, there was the possibility that further revisions would or could be made before ratification and implementation of the provision,[12] thus

---

11. Ignacio Marrero, one of the elected union representatives, was contacted at his home by a fellow employee who had just been told he was fired for failure to call-in on time. Marrero placed a call to protest this action, and was told that he also was being discharged for failure to call-in before 9 a. m. He testified that he had not been aware of any 9 a. m. rule prior to this incident.

12. The company itself admits this fact in their brief, but adds that this was unlikely. This court does not wish to engage in speculation as to whether it was likely; the fact remains that both sides agree that further negotiations were possible.

bargaining may not have been completed on the provisions. We find that there was sufficient evidence for the Board to conclude that the implementation of the call-in rule was a violation of Section 8(a)(5).

### E.

#### The 60-Day Probationary Provision

The company objects to the findings of the Board that the use of the 60-day probationary provision constituted violation of Sections 8(a)(5)(3) and (1).

The facts surrounding the provision are as follows:

As with the call-in rule, the company and union following the election reached tentative agreement as to seniority provisions, including the use of a 60-day probationary period. As was the case with all tentatively approved provisions, the union had stipulated that no agreement reached during negotiations was effective until ratification. In January, 1976 the company notified the union that it would be necessary, due to temporary difficulties, to lay off some 30 employees. A meeting was held on January 22, and a list of those to be laid off, effective January 23, based on seniority, was presented to the union. Included on the list was Ignacio Marrero, one of the recently elected union committeemen, who was also present at the meeting. He objected to the seniority date given to him by the company, April 8, 1975, and showed a letter which gave his date as October 29, 1974. After checking his file, it was agreed by both sides that the October date was correct. This change removed Mr. Marrero's name from the layoff list. When this mistake was discovered, the dates of all those on the list were checked and errors were discovered in eight cases, in all instances the employee having greater seniority than originally indicated on the list. However, these corrections only resulted in three changes in the layoff list: in addition to the removal of Marrero's name, the two employees with the greatest seniority were removed apparently as the result of the agreement to reduce the layoff to only 28 employees.

There was conflicting testimony as to whether the union was advised at this first meeting that the 60-day probationary provision was being used to determine the seniority date of employees. The testimony of the union representative was that no mention was made, either at the beginning of the session nor at any time during the meeting, including the extensive checking of employees files that took place at the meeting. The testimony of the company representative, Mr. Kinander, was found by the ALJ to be inconsistent. Although at one point he stated that mention was made at the beginning of the first session that the layoff was to be according to the "tentatively agreed provisions," he later stated that no specific mention was made of the 60-day probationary period. There was no explanation of why no mention was made of the critical provision during the re-checking of seniority date of those on the list, even though eight corrections were made. The testimony of Mr. Colosi, who also represented the company at these meetings, was found by the ALJ to be both vague and "disingenuous."

The company sent to the union a list, dated January 26, indicating the seniority dates of all employees. There was no objection by the union to any of these dates and there was no discrepancy between the dates on this list and the corrected January 22 list. On January 28, during a meeting about other matters, the union was supplied with a list of all those employees that had been laid off on January 23. This list incorporated all the corrections that had been made at the January 22 meeting and was in accordance with the January 28 list.

About a week later the union was contacted by the company and was told that there were errors on the layoff list and a meeting was scheduled for February 5. At that meeting the company stated that Marrero was being placed back on the list, since he had never completed his 60-day probationary period and therefore his se-

niority had been incorrectly computed. The union protested this action. Mr. Haderly testified that he reminded the company that the provision had been only tentatively agreed to and required ratification before it was effective, that the use of this provision had never been discussed nor approved by the union for this layoff, and particularly that the union had never discussed at any time or approved the retroactive use of the provision. At the conclusion of the meeting the union was told by Mr. Colosi that "we are calling the person with most seniority back, but we are not calling back those that did not complete the probationary period." [13] The union filed a complaint regarding this action.

From these facts the ALJ found that the provision had been used as a subterfuge to allow the company to lay off Ignacio Marrero, the union leader, and thus was a violation of Section 8(a)(3). Further, that the use of the provision violated the Section 7 rights of the six employees and that refusal to recall them violated Section 8(a)(1). The Board agreeing, additionally found that the provision amounted to unilateral action in violated of Section 8(a)(5).

■ As to the Section 8(a)(5) violation, the company argues, as it did with the call-in rule, that the implementation of a tentatively approved contract provision, particularly when it is beneficial to bargaining unit employees, [14] is not the kind of action which offends the policies of the Act, since the union has not been bypassed. However, as already pointed out in connection with the call-in rule, while the parties had tentatively agreed to the substance of the provision, the union had stipulated that no provision was to be effective until ratification; consequently, it was open to further negotiations. [15] Particularly we note that the parties had not yet bargained and agreed as to the effective date of the imple-

mentation of this provision, or whether it was to be applied retroactively to those already employed by the company. We also note that the facts as recited above, and the resolution of the issue, of whether the union had been told of the use of the provision, against the company, would indicate that the parties had agreed to a method of seniority for the layoff and that this was changed by the company on February 5. Consequently, we agree with the conclusion reached by the Board that by so doing the company engaged in unilateral action affecting conditions of employment which were still under negotiations, and such action "must of necessity obstruct bargaining" and thus violate Section 8(a)(5). *NLRB v. Katz*, 369 U.S. 736, 847, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

■ We move now to the Board's finding that the company discriminatorily used the probationary provision as a subterfuge to rid itself of Ignacio Marrero, a leading union advocate, thus violating Section 8(a)(3). It is undisputed that if the company had laid off Marrero when his seniority was computed as October 1974, i. e., taking him out of seniority order, such action would have constituted a clear violation. *NLRB v. Henry Colder Co.*, 416 F.2d 750, 753 (7th Cir. 1969). We find that there is substantial evidence on the record to support the finding that the company used the probationary provision to manipulate the seniority date of Marrero, so that it would be able to include him on the layoff list.

The record reveals that Marrero was a union activist and leader, he was one of the employees responsible for bringing the union to the company, and was one of the recently elected union representatives. The company does not dispute that it was opposed to the coming of the union. We recognize that a violation cannot be found

---

**13.** Colosi's report of the same incident was that "we told the Union at that time that we were not going to call these people back," identifying them as the "probationary people."

**14.** That it is a "beneficial" provision might be disputed by some of the employees. For example, if it were to be used, Marrero would suffer

a loss of six months in the computation of his seniority date, since the company had to lay him off during his initial period of employment with the company.

**15.** *See* n. 12, *supra.*

solely on the proof that an employee was active in the union and the employer was opposed to the union, *Nix v. NLRB*, 418 F.2d 1001 (5th Cir. 1969). However, it is necessary to add to these two items the bad faith demonstrated by the company, when, having agreed to a layoff method and list at earlier meetings, it abruptly announced a "mistake" and made a change resulting in the addition of the union leader to the layoff list. Marrero was the only employee for which a change in seniority meant being added to the layoff. We believe there is sufficient evidence to find that the company had indeed used the provision to rid itself of one of the union leaders, thereby attempting to weaken the union, and as such was a violation of Section 8(a)(3).

However, we have considerably more difficulty with the finding that the company violated the Section 7 rights of six employees included on the layoff list, and that by failing to recall them the company has committed a violation of Section 8(a)(1).

The ALJ in his findings stated that the company "admitted it laid off others . . . because they had not served the 'probationary period,'" and the Board agreeing, ordered reinstatement for the six "laid off under the unilaterally revised and discriminatorily imposed layoff list." We can find no evidence to support either of these conclusions. There was no such admission made by the company that we have been able to find. The record on the contrary indicates that the six employees in question were included on the original list submitted by the company on January 22.[16] There was nothing unusual in their names appearing on this list, since all six had been hired during the previous month; they apparently were included because they had least seniority, the agreed upon method for the layoff. The union did not dispute their

seniority dates, nor their inclusion on the list. We can perceive of no way in which these facts show that it was the subsequently used probationary period which caused them to be included on the layoff list.

Similarly, there is no evidence which would indicate that it was their union status which caused them to be placed on the layoff list.

However, even though we have determined that they were not laid off as a result of either retaliation or the probationary provision, it is still necessary to determine whether the company violated the Act by failing to recall these six employees.

The general rule is that "the Act does not purport to affect the normal right of the employer to select or discharge his employees. He has a right to exercise judgment as to what employees should best be retained or recalled." *NLRB v. American Pearl Button Co.*, 149 F.2d 258, 260 (8th Cir. 1945). The Board's inquiry is limited to a determination of whether in the exercise of these decisions the employer acted so as to "interfere with, restrain, or coerce employees" in the exercise of their statutory rights.

Having already indicated that all parties agreed that the layoff was for legitimate reasons, and that there was no showing or charge that all those laid off were union sympathizers, we also note that there is no evidence which would support a finding that a discriminatory motive was behind the company's failure to recall these employees.[17]

Further, we can find no evidence of any agreement reached at the January 22 meeting, or any subsequent meeting, that any of the employees laid off were to be recalled, by seniority or any other method. The

---

**16.** It has always been the position of the union that the probationary provision was not being used at the time the first list was presented to them and that it was the later use of this provision which constituted a violation. We find it to be inconsistent for the union now to claim that these six were included on this first list only because of the probationary period provision.

**17.** There was no evidence presented as to the union status of any of the six, and therefore no way to establish the company's knowledge of union activity, which is essential in order to prove that action is discriminatory. *Dubin-Haskell Lining Corp. v. NLRB*, 375 F.2d 568 (4th Cir. 1967).

record does not indicate that as a matter of past practice the company regularly recalled those it laid off. In fact the record clearly shows a pattern of total discretion on the part of the company as to these decisions.

We do not find the isolated statement of Colosi to Haderly to be sufficient proof to the contrary.[18] At most it indicates that the company agreed to recall Marrero, the person with the most seniority, as a concession to the union protests, but refused to make any further agreement or concession as to the recall of any other employees.

 It is clear that if the tentatively approved probationary provision had been in effect, the six would have no recall rights.[19] While the company may have later improperly applied the provision to the layoff, and we have found such action to be a violation, it does not prove that the employees in question did have previously existing recall rights, as suggested by the Board in their brief,[20] particularly where the record shows a pattern of behavior which is in direct contradiction to such an assumption.

We conclude the Board's determination that the company violated Section 8(a)(1) by failing to recall the six laid off employees is not supported by substantial evidence and the Board's order is modified to reflect that the reinstatement of the six is set aside.

For the foregoing reasons, the company's petition to set aside the Board's order is denied. The Board's cross-petition for enforcement is granted as modified.

---

18. See n. 13 and accompanying text, *supra.*

19. The tentatively approved provision states: "There shall be no seniority among probationary employees and grievances shall not be presented in connection with the discharge or layoff of probationary employees."

20. The brief refers to the company's "unilateral abrogation of seniority and recall rights [constituting] a change in the employment relation." (Br. at 28).