**NACKER PACKING COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 78–2385.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1979.

Decided Feb. 12, 1980.

Thomas P. Krukowski, Milwaukee, Wis., for petitioner.

Allison W. Brown, Jr., N.L.R.B., Washington, D.C., for respondent.

Before TONE and WOOD, Circuit Judges, and WILL, Senior District Judge.*

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

458

WILL, Senior District Judge.

Nacker Packing Company (Company) brings this petition to review a Decision and Order of the National Labor Relations Board (Board). The Board has filed a cross-application for enforcement of its order.[1] In its final decision and order, the Board determined that (1) the Company through a program of written and oral warnings and several suspensions had unlawfully harassed and discriminated against its employee, Everett Rekow, in violation of Sections 8(a)(3), (4) and (1) of the National Labor Relations Act (Act), subsequent to Rekow's reinstatement at the Company pursuant to an earlier unfair labor practice proceeding before the Board, and (2) that the Company had separately violated Section 8(a)(1) by threatening that reprisals would be taken against Rekow and other employees because Rekow had invoked the Board's assistance. For the reasons hereinafter stated, we grant the petition for review in part and deny the petition for review in part.

## DISCRIMINATORY HARASSMENT OF EVERETT REKOW

The Company is engaged in the slaughtering of calves and the processing of veal at its plant located in Milwaukee, Wisconsin. The Company employs 10 production employees, four part-time truck drivers, and one clerical employee. The Company's owners, Ralph Gehrmann (President) and Roger Nacker (Vice-President), regularly participate in production work and, along with Nacker's son, John, and Larry Weslowski, supervise the employees.

In January, 1975, the Company was struck by the union which then represented its production employees. Among the participants in the strike was Rekow, who had been continuously employed by the Company since 1962. Rekow has also been continuously employed by the Company since March 28, 1977. The strike ended unsuccessfully in the spring of 1976. In late August 1976, the Company notified Rekow, who had secured other employment during the strike, that it had available a production position to which he could be reinstated. Rekow's efforts to secure reinstatement were subsequently rejected by the Company, however, and Rekow filed an unfair labor practice charge against the Company based upon its failure to reinstate him. Pursuant to a hearing on February 14, 1977, an Administrative Law Judge (ALJ) for the Board determined on March 11, 1977 that the Company had violated Sections 8(a)(3) and (1) of the Act by refusing to reinstate Rekow. The ALJ concluded that Rekow was entitled to reinstatement and back pay from August 31, 1976.

Rather than appeal the ALJ's decision to the Board,[2] the Company notified Rekow of its intention to reinstate him and Rekow was reinstated to his production position on March 28, 1977. It is the Company's treatment of Rekow after his reinstatement that the Board concluded was discriminatorily motivated and in violation of Sections 8(a)(3), (4) and (1), which conclusion the Company challenges in this petition for review.

Subsequent to his reinstatement on March 28, Rekow's work performance was carefully watched by Company supervisors and Rekow began to receive written warnings based on an apparently slow rate of production. Thus, on March 29, Rekow was called into the plant office and told that his production was too slow. A written memorandum of this discussion was prepared, which Rekow refused to sign, and was placed in the Company's personnel file on Rekow. He received similar notifications for lack of production or poor production quality on March 30 (twice), April 5 and April 7. On each of these occasions, Rekow was called into the office, and informed of the production problem.

During his lunch hour on April 7, Rekow cut his left hand and thumb while cleaning his tools. After bandaging his hand on the Company premises, Rekow remained at

1. The Board's Order was issued on September 29, 1978 and is reported at 238 NLRB No. 160.

2. The recommended order and remedy of the ALJ was adopted by the Board through summary action on April 13, 1977.

work, and continued working through April 11. On April 11, Rekow's slowness in production was again the subject of a written notation in Rekow's file. On April 12, Rekow entered the hospital due to a serious infection in his left thumb arising from the earlier cut.

Rekow remained in the hospital until May 3, and thereafter received physical therapy for his left hand. When Rekow ultimately returned to work on June 1, Gehrmann advised Rekow that "the honeymoon was over" and that the Company now expected Rekow to keep pace with the other production employees. Rekow's slowness in production was again written up on June 4 and June 7. On the afternoon of June 23, Gehrmann assigned Rekow to the job of calf-skinning, rather than to the gutting or boning jobs which Rekow generally performed. When Rekow stated that he could not hold his knife in his left hand well enough to enable him to skin the left side of the calf, Gehrmann instructed Rekow to skin the whole calf or go home. Rekow then left work early. He subsequently produced a doctor's examination report confirming the weakness and lack of agility in his left hand.

On July 1, Rekow was suspended one week for insubordination. On this occasion, contrary to at least one previous discussion which Rekow had had with Nacker in which he instructed Rekow to work on all carcasses in the boning cooler, Rekow passed over certain carcasses. Following this suspension, Rekow filed the unfair labor practice charges, the Board's decision on which gives rise to this petition.

Subsequent to Rekow's return to work after the week suspension, Rekow received further write-ups on July 18, July 19 and

July 20. Finally, on October 24, Rekow was suspended for a portion of the afternoon for refusing to bone as directed by his supervisor.

After three days of hearings, the ALJ found that the Company had violated Sections 8(a)(1), (3) and (4) of the Act by issuing oral and written warnings to Rekow during a period between March 29, and July 1, 1977, by the one week suspension beginning July 1, and by the partial day's suspension on October 24. The ALJ concluded that the Company had

> not purged the unlawful discrimination against Rekow during the period after the first unfair labor practice proceedings but persisted thereafter in a continuing pattern of discriminatory harassment evidencing its desire to circumvent its obligations under a remedial reinstatement order, hence discouraging union activity and frustrating access to Board processes.

Without modification, the Board affirmed the ALJ's findings and conclusions.

In reviewing the Board's decision, it is our duty to determine whether it is supported by "substantial evidence" in the record.[3] In applying the "substantial evidence" standard, we must "examine the entire record, including the evidence opposed to the Board's view, to determine whether the record contains 'such evidence as a reasonable mind might accept as adequate to support a conclusion' and to find that the decision is 'justified by the fair estimate of the worth of the testimony of the witnesses or its informed judgments on matters within its special competence.'" *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331 (7th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–

---

**3.** The Company, relying on certain language in the ALJ's opinion and certain comments made by the ALJ during the hearing, initially contends that the ALJ determined that the Company's conduct was "inherently destructive" of Rekow's rights and that this determination presents a question of law such that no deference to the Board's determination is required. We disagree.

A fair reading of the ALJ's decision, affirmed without modification by the Board, indicates

that he found the Company had exposed Rekow to a "continuing pattern of discriminatory harassment evidencing its desire to circumvent its obligations under a remedial reinstatement order, hence discouraging union activity and frustrating access to Board processes." This determination of unlawful motivation is subject to the traditional "substantial evidence" standard of review. *E. g., Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331 (7th Cir. 1978).

90, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951)). Thus,

> we are not empowered to rubber-stamp the Board's decision simply because the supporting evidence may be "substantial" when considered by itself and in isolation from the evidence that fairly detracts from the Board's conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 463–66, 95 L.Ed. 456 (1951). Rather, we must take into account the entire record, including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn. *Id.*, at 487–88, 71 S.Ct. 456.

*NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir. 1977). Where there is substantial evidence in the record to support the Board's decision, the decision is entitled to affirmance "even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 488, 71 S.Ct. at 465.

Applying these principles to the Board's decision and to the record in this case, while we might have reached a decision contrary to that reached by the Board, we find that there is substantial evidence in the record to affirm the Board's conclusion that the Company's treatment of Rekow after his reinstatement from March 29 through June 23[4] by issuing written and oral warnings was discriminatorily motivated and in violation of Sections 8(a)(1), (3) and (4). However, as to Rekow's suspension on July 1 and his partial day's suspension on October 24, we do not find substantial evidence in the record to support the Board's determination and accordingly reverse that portion of the Board's order.

There is substantial evidence in the record to support the Board's determination that the Company's issuance of written and oral warnings to Rekow from March 29 until Rekow's entry into the hospital on April 12 were in violation of the Act. Beginning on the second day following his reinstatement, Rekow was either directly given or was the subject of six written "warnings" which documented his lack of or his slowness in production during his first two weeks back at work. While the Company's written "warning" system had apparently been in operation since 1972, only one such warning had ever been placed in Rekow's file prior to the 1975 strike. Other production employees who were told during the several months prior to Rekow's reinstatement that their production was too slow were not given written warnings. Additionally, the record supports the conclusion that Rekow was particularly carefully watched by the Company's supervisors from the time of his reinstatement. Not only was this unique supervision system applied only to Rekow upon his reinstatement but other evidence supports the conclusion that the system was applied in a less than even-handed manner. Thus, on March 30, Rekow's third day of work, he was assigned to skin calves, even though this was a job Rekow had infrequently performed during the several years before the strike. When Rekow received a warning based on produc-

---

4. The ALJ, affirmed by the Board, determined that the Company had violated the Act by issuing written and oral warnings during the entire period from March 29 through July 1. The ALJ's decision, however, discusses no such written or oral warnings during the period from June 23 through July 1, and the only incident during this time period mentioned in the ALJ's decision is an argument between Gehrmann and Rekow on June 24 over whether Rekow had been sent home or had left voluntarily on June 23.

The only record evidence of any warning or disciplinary action taken by the Company during this period is Rekow's testimony that Nacker told him orally on the morning of June 29 that his production in boning was too slow, and that Nacker had someone watching Rekow on the kill floor. There is no evidence in the record as to whether Rekow's production on this occasion was, in fact, poor, and no testimony, other than Rekow's, that the conversation took place. Based on the entire record in this case, however, as to Rekow's less than adequate production performance, we do not find substantial evidence in the record to conclude that this oral warning was discriminatorily motivated. Accordingly, we only affirm the Board's finding with respect to the discriminatory treatment of Rekow through the June 23 suspension date.

tion which was less than that of the other production employees, and attempted to defend his performance on the ground that he was not accustomed to skinning, Nacker told him that Rekow had told the Board's ALJ in the earlier unfair labor practice hearing that he was a calf-skinner. Similarly, although Rekow's cut left hand apparently impaired his ability to skin, Rekow was nonetheless assigned to calf-skinning on April 11 and was again written up for lack of production and poor quality in production.

The Company contends that its use of the written notification system upon Rekow's reinstatement was not to harass or discriminate against Rekow, but was to encourage Rekow to increase his rate of production to the levels currently demanded by the Company of other employees. In this regard, although utilizing one fewer production employee, the Company in 1977 had dramatically increased its rate of production from the pre-strike levels in 1974. Rekow had apparently been a slow employee before the strike, at one point having been given a week's suspension for lack of production. The Company claims that its use of a written warning procedure system following Rekow's reinstatement was designed solely to counsel Rekow so that he knew what was expected of him and how to improve.

█ Were this case before us for *de novo* review we might agree with the Company's contentions. However, this is not the relevant standard. *See NLRB v. Gogin,* 575 F.2d 596, 601 (7th Cir. 1978). Moreover, the employer's motivation is a question of fact to be determined by the Board from a consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence. *Id.* Based on the record before us and the reasonable inferences which can be drawn, we find substantial evidence to support the Board's finding of a violation with respect to the Company's early issuance of oral and written warnings to Rekow from March 29 to April 12, immediately after his reinstatement.

█ Similarly, while the question is closer with respect to the incidents between June 1 and June 23, we find substantial evidence in the record to support the Board's conclusions that the Company's issuance of written warnings and the brief suspension of Rekow on June 23 were a continuation of its unlawful treatment of him. In determining that the Company's treatment of Rekow during this period was discriminatory, the ALJ and the Board relied heavily upon the conclusion that the Company had callously responded to Rekow's medical condition upon his return to work on June 1. Emphasis was placed by the ALJ on the Company's apparent belief that Rekow was fully able to perform all production duties as of June 1 when both Rekow and a May 24 report from a doctor who had examined Rekow indicated that he had not yet fully recovered. While a fair reading of the May 24 letter does not so clearly support the Board's decision, there is substantial evidence in the record that the Company was not fully responsive to Rekow's medical needs upon his return to work on June 1. For example, on June 4, Rekow was written up for slow production in the performance of the job of boning entire calves. This work assignment, supposedly made as a result of Rekow's slow performance at his usual job on the kill line, was one to which no other employee had been assigned since prior to the strike. Finally, with respect to the June 23 "suspension," there is substantial evidence to support the conclusion that the Company assigned Rekow to the job of calf-skinning, which requires the use of two hands, at a time when Rekow was still recovering from the injury to his left hand and when use of a knife in his left hand so as to skin the entire calf might expose him to injury. Rekow's assignment to skinning on this day was not his normal work assignment, and was made at a time when other jobs were apparently available for him to perform. Based on Rekow's credited testimony [5] that Gehrmann gave him an ultimatum of skinning the entire calf or going home, we find substantial evidence in the record to sup-

5. This determination of the witness' credibility lies peculiarly within the special province of

the trier of fact, *NLRB v. Braswell Motor Freight Lines,* 486 F.2d 743, 745 (7th Cir. 1973),

port the conclusion that Rekow's early departure on June 23 was the result of unlawful Company conduct.[6]

It is beginning with Rekow's one week suspension on July 1, however, that our review of the record convinces us that the Board's determination that the Company violated Sections 8(a)(1), (3) and (4) is not supported by substantial evidence. Rekow's suspension on that day arose from a dispute between Nacker and Rekow over Rekow's failure to work on certain carcasses. According to Rekow, Nacker had observed him working in the boning cooler on carcasses bearing brands on each individual cut but that Rekow had passed over other carcasses which, though not bearing brands on each individual cut, had been branded and were fully ready to be worked upon. Rekow acknowledged that, prior to this time, he had been informed by Nacker that all the carcasses in the boning cooler, whether bearing individual brands or not,

were ready to be worked upon. He further acknowledged that on July 1 he should have begun with the non-individually branded carcasses but failed to do so out of his "habit" of working on the individually branded carcasses first. Rekow stated that Nacker yelled at him, ordered him to the office, and proceeded to tell Gehrmann that Rekow had yelled at him. Gehrmann then told Rekow he was getting a week's suspension for insubordination. Nacker's version of the incident was slightly different. He stated that he had explained to Rekow on three or four prior occasions that all carcasses in the boning cooler were ready to be worked upon. Thus, when Rekow responded to his inquiry as to why Rekow was not boning the carcasses in order by stating that the first carcasses were not branded, Nacker told Rekow that he'd had enough and to go to the office.

The ALJ hearing Rekow's and Nacker's testimony considered neither "entirely

---

and absent exceptional circumstances, will not ordinarily be disturbed on review. We see no reason to disturb this credibility resolution.

**6.** While we affirm the Board's conclusion with respect to the Company's treatment of Rekow during the June 1-June 23 period, we might well have arrived at a different conclusion had the matter been before us *de novo*. For example, the ALJ's conclusion that the May 24 medical report is in stark contrast with the Company's attitudes and actions with respect to Rekow's medical condition upon his return seems highly exaggerated. In contrast to the paragraph from that report relied upon by the ALJ, one of the earlier paragraphs states:

REMARKS: Patient progressed in his recovery from what I consider to have been a rather pronounced infection of the palmar fascia, including the thumb, in connection with the industrial injury of April 7, 1977, to a point where I feel that he is fully capable to resume his industrial activities after he is examined by Dr. Modaff on May 31. There is no more evidence of an infection, and his best remedy to regain the dexterity of the left hand as well as the lacking motion in the fingers, would be active use of the hand at work.

Attributing discriminatory motives to the Company's belief that Rekow should be able to perform with the rest of the employees upon his return does not seem so clear in light of the full report.

Moreover, apart from the June 23 incident, it does not appear that Rekow was deliberately assigned work which was difficult for him to

perform with a weakened left hand. While conceivably the Company should have been more tolerant and, hence, not written Rekow up for slowness in production on June 4 and 7, we do not find the Board's conclusion that these reports evidence continuing discrimination to be inevitable.

Finally, the circumstances surrounding Rekow's leaving work early on June 23 are not unambiguous. Rekow had already apparently tested Nacker's patience that day: Nacker had had to tell Rekow to quit stalling when Rekow at the start of work in the morning was pushing a squeegee across the boning room floor, claiming the floor was wet. The Board's own witness, Clarence Steffen, stated that he had never seen any other employee use a squeegee either in the boning room or at the start of work in the morning. Nor does it seem self-evident that the assignment of Rekow to calf-skinning for the first time since his return on June 1 some *three weeks* earlier demonstrates discriminatory treatment. Three weeks does not appear on its face to be an unreasonable length of time for the Company to have waited and observed his recovery prior to Rekow's assignment to this job. Nor does it seem clear to us that the Company had an obligation, apart from not being motivated in suspending Rekow for impermissible reasons, to keep on the job an employee who was not fully able to perform the full range of duties which might be required of him.

trustworthy." The ALJ, affirmed by the Board, concluded that

I also do not believe, as Rekow testified, that Nacker's reaction was provoked simply by Rekow's election to bone the branded calves out of order. Instead, it is the more probable that Nacker's temperament was aroused on that occasion by conduct on the part of Rekow manifesting continuing mistrust of the legitimacy of Respondent's branding practices. I am convinced that the layoff was an act of frustration with Rekow but one which cannot be disassociated from other aspects of Respondent's conduct toward him,

and that the week suspension was thus a continuing part of the Company's discriminatory harassment of Rekow.

■ While there is little doubt that the July 1 suspension was "an act of frustration with Rekow," we are unable to find substantial evidence supporting the Board's conclusion that the suspension was part of a continuing effort to harass and discriminate against Rekow in violation of the Act. Most importantly, it is clear that Rekow's suspension for insubordination, even crediting his version of having been told only once previously by Nacker to work on all carcasses in the boning cooler, was justifiable. Rekow himself acknowledged before the ALJ that he should have worked on the unbranded carcasses first, but nonetheless failed to do so in direct contravention of previous employer instructions.

■ The existence of cause for Rekow's suspension does not, however, end our inquiry, for it has long been settled in this Circuit that a suspension or discharge is unlawful under the Act if it is motivated, even in part, by a desire to discourage union activity. *Chicago Magnesium Castings Co. v. NLRB*, 612 F.2d 1028, 1034–35 (7th Cir. January 7, 1980); *NLRB v. Gogin, supra*, 575 F.2d at 601–02; *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 386 (7th Cir. 1971). However, in addition to the exist-

ence of the immediate cause for Rekow's suspension on July 1, a fair reading of the entire record compels the conclusion that the Company's "frustration" with Rekow expressed in the July 1 suspension had a solid foundation in Rekow's substandard production performance, his unresponsive work attitude and his insubordination.

■ The ALJ discounted the Company's efforts to demonstrate that Rekow was a poor worker, finding both Nacker's and Gehrmann's testimony and the testimony of two of the Company's employee witnesses (Reyes and Bulic) unreliable, and paid scant attention to the testimony bearing on Rekow's uncooperative work attitude, except to determine that "one could hardly expect more considering the fear inspiring work environment Respondent unlawfully forced upon him." Even respecting the ALJ's discrediting the testimony of these Company witnesses, *NLRB v. Braswell Motor Freight Lines*, 486 F.2d 743, 745 (7th Cir. 1973), the testimony of the other production employee witnesses—including those presented by the Board—clearly compels the conclusion that Rekow was a slow worker and that Rekow (though possibly not the only employee to do this) had a tendency to slow down when the supervisors were not present. Moreover, their testimony indicates that Rekow would persist in certain unnecessary work practices, such as the constant steeling of his knife or the hosing down of each gutted calf, even after being instructed on numerous occasions not to do so by his supervisors. Furthermore, the testimony of these non-discredited production employees indicates that, when Rekow was instructed by a supervisor to cease a certain time-consuming work practice, Rekow would simply ignore the instruction and grin.[7] Given this record, we cannot accept the ALJ's conclusion that Rekow's work deficiencies "were not attributable to laziness or indifference but to stubborn adherence to fastidious time-consuming work habits." Rather, the record clearly indicates that Rekow, in addition to being a slow employee, on occasions

---

**7.** Clarence Steffen, a production employee called by the Board, testified that Rekow had a tendency to slow down his production when a supervisor was not present (R. 153); that,

while it was normal for there to be one or two calves backed up before the gutting work station on the kill line, Rekow would sometimes have five or six calves backed up (R. 154); and

other than July 1 deliberately tested and resisted his employer's legitimate production orders.

Notwithstanding our affirmance of the Board's determination that the Company's supervision and treatment of Rekow during the March 29 through June 23 period was in violation of the Act, we do not find that this conclusion or the evidence which underlies it leads necessarily to affirmance of the Board's determination with respect to the July 1 suspension. Rather, we find that the record taken as a whole clearly demonstrates that Rekow's one week suspension arose from his failure to follow Company instructions with respect to working on all carcasses and was motivated by the Company's legitimate production and disciplinary concerns. We are unable to find substantial evidence in the record to support the Board's conclusion that this suspension was in violation of the Act.

Similarly, we fail to find substantial evidence in the record to support the Board's determination that Rekow's part-day suspension on October 24 was unlawfully motivated. The record shows that, on the morning of October 24, Nacker repeatedly advised Rekow to perform a boning operation in a specific fashion so as to prepare the veal in accordance with a customer's order but that Rekow continued to bone in a manner incompatible with the order. In the afternoon, John Nacker, who was recog-nized by the production employees other than Rekow as a supervisor, instructed Rekow to work faster. Rekow, in turn, told John Nacker to work faster himself.[8] Roger Nacker, upon later observing a back-up at Rekow's work station, told Rekow that if he didn't feel like working, he should take the rest of the day off.

 Contrary to the Board's determination, *nothing* in the record, absent an assumption that the Company's prior discriminatory treatment of Rekow somehow infected its decision on this occasion, supports the conclusion that the part-day suspension of October 24 was motivated for any reason other than justifiable cause on the Company's part. Cause for the part-day's suspension on this day was overabundant. Counsel for the Board in oral argument conceded this. We do not find any evidence to support the Board's determination in view of the entire record in this case.

Accordingly, for the reasons stated, the Board's finding of a violation of the Act is affirmed as to the Company's written and oral warnings to Rekow from March 29 through June 23 and as to Rekow's suspension on June 23. However, finding no substantial evidence in the record with respect to the July 1 or October 24 suspensions, we reverse this portion of the Board's order.

*THREAT OF REPRISALS*

 The Board additionally found that the Company independently violated Sec-

---

that on one occasion when Nacker instructed Rekow several times to cut a flank in a particular fashion, Rekow did not obey and continued to bone in his own way (R. 155). Richard Pochowski, also a production employee called by the Board, similarly testified that Rekow slowed down when supervisors were not present, though apparently Rekow was not alone in this (R. 165, 168–69), and that he had been present when Nacker had had to tell Rekow several times to cut the flanks in a particular fashion before Rekow complied (R. 170). Pochowski further testified that he had heard Nacker tell Rekow several times to cease the practice of excessively steeling his knife, and that Rekow's response to such instructions was to grin (R. 169–70). Pochowski understood Rekow's grin to mean "you can holler at me all you want, I'm just gonna do it anyway." (R. 170). Joseph Bray, a production employee called by the Company, testified that whereas he would use a hose on one out of every 40–50 gutted calves, Rekow used the hose on nearly every calf (R. 241–42). Similarly, whereas Bray steeled his knife after every fourth or fifth calf, Rekow would steel every time he took out a stomach and again when he took out the liver (R. 243). Bray further testified that he had heard Nacker repeatedly tell Rekow that he either steeled his knife or used the hose too much, but that Rekow's response was either to grin or mumble (R. 243, 244). Bray also indicated that while the usual backup at the gutting work station was 2–3 calves, when Rekow worked there, there was an average of 10 calves backed up (R. 251).

8. Rekow's version of the incident with John Nacker was somewhat different. The ALJ apparently did not, however, credit Rekow's account, as his decision sets forth the facts surrounding the October 24 suspension as they are set forth here.

tion 8(a)(1) by certain remarks and threats which Gehrmann and Nacker made to Rekow and the other production employees on January 12, 1978. The credited testimony indicates that Gehrmann told the assembled employees that "one son of a bitch" had been "taking the Company to court and has been costing . . . lots of money," and that Nacker subsequently told Rekow it would be Rekow's fault if he and Gehrmann had to sell the business and the other employees lost their jobs. These remarks were made four days prior to the final day of the hearing before the ALJ on the unfair labor practice charges in this case.

Substantial evidence exists in the record to support the Board's determination that these remarks constituted impermissible threats against Rekow and the other employees because of Rekow's resort to the Board's procedures. *Cf. NLRB v. Jack La Lanne Management Corp.*, 539 F.2d 292, 294 (2d Cir. 1976); *Walgreen Co. v. NLRB*, 509 F.2d 1014, 1016 (7th Cir. 1975). Accordingly, we affirm this portion of the Board's order.