**GOLD COAST RESTAURANT CORPORATION D/B/A Bryant & Cooper Steakhouse, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–1533.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1992.

Decided June 11, 1993.

---

**4.** That might be the most convenient way for district judges to handle these sorts of cases in the future.

Petition for Review of an Order of the National Labor Relations Board (304 NLRB No. 96).

Martin Gringer, Garden City, NY, argued the cause, for the petitioner.

Vincent J. Falvo, Atty., N.L.R.B., argued the cause for the appellee. On brief were Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Atty., N.L.R.B., Washington, DC.

Before RUTH BADER GINSBURG, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The employer petitions for review of the findings of the National Labor Relations Board (NLRB or Board) that it engaged in unfair labor practices in response to a unionization drive among its employees. We deny the petition in all respects except two: we remand to the Board to amend, consistently with this opinion, its order regarding the employer's written disciplinary system and we do not reach the NLRB's decision to order a second union election.

## I. Background

### A. Treatment of Employees Engelhardt and Ramirez

In September 1985, James, Gillis and Dean Poll (Polls), the sole shareholders and directors of Gold Coast Restaurant Corporation, purchased a restaurant called Manero's in Roslyn, New York. At the time, the Hotel Employees and Restaurant Employees Union Local 100 (Union) represented Manero's workers. Several months later, however, the employees voted to leave the Union. In July 1987 the Polls closed the restaurant for extensive remodelling. They redecorated the restaurant's interior, upgraded the bar and the menu and renamed it Bryant and Cooper's Steakhouse (B & C). Upon re-opening, the Polls offered jobs to all of their old employees.

Several months after B & C opened, some of its employees attempted to reunionize the restaurant. A few employees, including Stephen Engelhardt, a waiter, distributed union authorization cards and urged waiters, busboys and kitchen workers to sign the cards. As a result of their effort, on November 20, 1987, the employees petitioned B & C for an election. Trouble began two days later. First, the Polls instituted a formal, written system of discipline at the restaurant. Before then, they had kept no employee disciplinary records. Second, the Polls made changes in employees' work schedules. Engelhardt and his partner,[1] Gallo Ramirez, both full time waiters, routinely worked Friday and Saturday nights. Those nights, the busiest of the week, produced the best tips. On November 22, the Polls posted a new work schedule which removed Engelhardt and Ramirez from the Friday and Saturday night shifts. The schedule also changed Engelhardt's day off from Monday to Wednesday. When Engelhardt and Ramirez complained to the Polls about the changes, the Polls gave the two their old shifts in time for them to work the upcoming weekend and changed Engelhardt's day off to Monday. The Polls claimed they had simply made an error in the schedule. Nonetheless, Engelhardt saw the schedule change as retaliation for his role in petitioning for a union election.

Subsequently, the Polls questioned Ramirez about his involvement in union activities. Gillis Poll asked Ramirez about the amount of union sympathy among the employees. Another time, James Poll called Ramirez into his office, where all three Polls were waiting, and tried to discover whether Ramirez supported the Union and whether Ramirez knew of other employees who supported it.

On December 4, Dean Poll sent an open letter to all employees, urging them not to vote for unionization in the upcoming election. The letter noted the changes at the restaurant since the employees were last unionized. The letter concluded:

We firmly believe that a union is not necessary nor desirable here. The restaurant business is a gamble. We have hit upon a formula that will get us to the top

---

1. Waiters at B & C worked in teams of two.

and keep us there. This would be good for everyone. A successful business is the only job security in the restaurant business. I can tell you about hundreds of restaurants in New York which were unionized that have gone out of business. The union was unable to do anything to save the jobs of the employees in these restaurants. In our opinion, the union may have even contributed to some of these closings. Service tends to get lazy and tired at these places. When people come to these places, they don't have a good time and they don't come back. When that happens, a closing is inevitable.

We don't want that to happen here. You have an opportunity to prevent it.

Joint Appendix (J.A.) at 86–87.

Eight days later, the Union lost the election by a vote of 18 to 16 but the result did not bring peace to the steakhouse. On December 14, the Polls once again split up the team of Engelhardt and Ramirez and switched Engelhardt's day off to Wednesday. They said they made the change because Engelhardt repeatedly showed up late to work Wednesday lunches. On that date, James Poll also approached Ramirez and stated, "You got all my people from the kitchen."

At the same time, Engelhardt began to antagonize the B & C management. After the election, Engelhardt refused to follow the customary practice of tipping the bartenders because he suspected they had voted against the Union. Although Engelhardt claimed that other waiters followed suit, B & C, operating under its new written disciplinary system, issued a warning to Engelhardt only. It issued another warning to Engelhardt for reporting to work late on December 17. Engelhardt claimed that other waiters frequently came to work late and did not receive formal warnings.

Two days later, Engelhardt received another written warning—this time as the result of an incident the Polls viewed as serious insubordination. Judy Roberts, B & C's bookkeeper, told Engelhardt she was expecting a guest at the restaurant and asked Engelhardt if he knew who would be serving him. Engelhardt remarked that if he were

waiting on the guest, he would probably "spit in his food." When Roberts told Gillis Poll of the incident, Poll confronted Engelhardt who claimed that the remark was a joke. Poll then issued Engelhardt a formal warning.

On December 29, B & C issued two more warnings to Engelhardt and then suspended him from work for five days. The first warning resulted from a conversation Engelhardt had with Gillis Poll. Due to a back injury, Engelhardt had missed work on Christmas Eve. When he returned on the 29th, Gillis Poll asked him if his back was better. Engelhardt answered, "Why, do you want it to be?" Poll then issued a formal warning. The second warning involved Engelhardt's failure to report his tips for income tax purposes. B & C maintained that Engelhardt reported less than five percent of his check total as tips while company policy required waiters to report at least eight percent. Because he believed B & C knew that many waiters at the restaurant were underreporting tip income, Engelhardt viewed this warning as discriminatory disciplinary action.

Toward the end of his shift on December 29, Engelhardt left the floor of the dining area and went to a back room to tally his checks and smoke some cigarettes. Other employees were also smoking in the room. B & C prohibited smoking in the restaurant but employees sometimes smoked in the back room with management's knowledge. That night, Gillis Poll approached Engelhardt and asked him what he was doing. Engelhardt replied that he was tallying his checks. Poll said nothing else until later that night when he told Engelhardt that he was suspended for five days. B & C did not take disciplinary action against any other personnel for smoking in the back room that night.

On January 9, Engelhardt returned to work. He and Ramirez were working in the same area of the dining room but not on the same team. After watching Ramirez help Engelhardt serve some wine, Gillis Poll ordered Ramirez into the kitchen and suspended him for five days for working with Engelhardt. Later, he also suspended Engelhardt, telling him that he was costing the Polls more money than he was worth. B & C

claimed that Ramirez and Engelhardt had "pooled their stations" for the evening in violation of company policy. Engelhardt and Ramirez maintained that they were merely following the company policy of helping each other whenever possible.

Finally, on January 21, Engelhardt quit his job at B & C. He filed an unfair labor practice complaint with the NLRB and the NLRB General Counsel issued a complaint alleging *inter alia* that, beginning in mid-December, Gillis Poll systematically reduced Engelhardt's tips by preferentially seating customers in sections assigned to other waiters. Engelhardt testified that his tips fell from approximately $500 per week to $300 per week, making it impossible for him to continue working at the restaurant.

### B. Discharge of Rense Schalen

Rense Schalen began working at B & C several months after the events involving Engelhardt and Ramirez. In September 1988 Schalen, along with several other waiters, agreed to work a private party at B & C before the normal shift. They expected to be paid $106 each but, at the end of the party, each waiter received only $70. The waiters discussed the matter among themselves during their normal shift and decided to talk to Gillis Poll about it after the restaurant closed. Before his shift ended, however, Schalen called his girlfriend from a pay phone near the bar and told her what had happened, indicating that he intended to file a formal complaint with the NLRB. Dean and Gillis Poll were seated at the bar a few feet away. When Schalen hung up, Dean Poll asked him if he objected to the $70 payment. Schalen replied that "We are very unhappy." Gillis Poll then asked if Schalen represented all of the waiters. Schalen indicated he did not. A loud discussion followed, ending with Dean Poll's demand that Schalen "get the —— out" if he was unhappy.

Later that evening, the other waiters complained to the Polls and received the full $106. Before leaving, Schalen attempted to approach Dean Poll again but Poll told him "We have nothing to say, so get out." Schalen filed an unfair labor practice complaint with the NLRB, challenging his discharge.

### C. Administrative Law Judge's Findings

The National Labor Relations Act (NLRA or Act) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) [hereinafter section 8(a)(3)]. It is also an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of their organizational rights guaranteed by the Act. 29 U.S.C. § 158(a)(1) [hereinafter section 8(a)(1)]. Finding the facts as outlined above, the Administrative Law Judge (ALJ) concluded that B & C's treatment of Engelhardt and Ramirez resulted in violations of sections 8(a)(1) and 8(a)(3). Specifically, the ALJ concluded that the Polls' repeated questioning of Ramirez and other employees regarding their union activity constituted interrogation and also created an "impression of surveillance" in violation of section 8(a)(1). The ALJ also determined that the changes in Engelhardt's and Ramirez's work schedules, the institution of a written warning system, the selective use of the warning system against Engelhardt and Engelhardt's two suspensions violated sections 8(a)(1) and 8(a)(3). Finally, the ALJ concluded that Engelhardt was constructively discharged because of his union activity in violation of sections 8(a)(1) and 8(a)(3).

The ALJ found against Schalen, however, concluding that Schalen was not discharged for engaging in protected activity. He found that Schalen had not acted on behalf of the other waiters and that B & C management had no reason to believe he was so acting.

### D. The NLRB Order

The NLRB adopted the ALJ's findings that B & C had violated sections 8(a)(1) and (a)(3) during its employees' unionization effort. The Board agreed that B & C had issued an improperly threatening campaign letter, a letter the Board viewed as violative of section 8(a)(1). It also concluded that B & C improperly changed Ramirez's and Engelhardt's work schedules shortly after B & C received the petition for an election. Decid-

ing that B & C's behavior constituted grounds for setting aside the election, it directed the NLRB Regional Director to supervise a new union election "whenever the Regional Director deems appropriate." At the time this case was submitted to the court, the election had not yet been held.

As for B & C's other actions against Ramirez and Engelhardt, the NLRB ordered B & C to offer Engelhardt immediate reinstatement with backpay and to remove from its records any reference to Engelhardt's discharge, suspensions and written warnings. To remedy the remaining violations, the NLRB issued a cease and desist order. requiring B & C to stop "interrogating its employees," changing work schedules, "[i]nstituting a formal written warning system, ... [i]ssuing written warnings to its employees pursuant to the written warning system" and suspending or discharging employees because of their protected activity on behalf of the Union.

Finally, the NLRB disagreed with the ALJ's conclusion that B & C had not acted improperly in discharging Schalen. Instead, it concluded that B & C had discharged Schalen for engaging in protected activity. Notwithstanding Schalen's denial that he was acting on behalf of the other waiters, the Board concluded that he was in fact speaking for the group because he (1) communicated the dissatisfaction of the entire group to Gillis Poll, (2) relayed a complaint that flowed from B & C's treatment of all of the waiters and (3) indicated during his telephone call an intent to take the complaint to the NLRB. The Board ordered B & C to offer to reinstate Schalen with backpay. B & C petitions for review of the Board's order in its entirety.

## II. Discussion

■ When the NLRB reaches a conclusion different from that of the ALJ, we consider the entire record, including the ALJ's findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Nonetheless, we must affirm the NLRB's findings of fact if they are supported by substantial evidence in the record as a whole. *Cf. Pension Benefits Guar.*

*Corp. v. Federal Labor Relations Authority,* 967 F.2d 658 (D.C.Cir.1992). Moreover, we owe substantial deference to inferences the Board has drawn from the facts, *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir. 1980), and to the "reasoned exercise of [the Board's] expert judgment," *Conair Corp. v. NLRB,* 721 F.2d 1355, 1373 (D.C.Cir.1983). We will not, however, "merely rubber stamp NLRB decisions." *Avecor, Inc. v. NLRB,* 931 F.2d 924 (D.C.Cir.1991).

### A. Discharge of Rense Schalen

■ The NLRB found that B & C improperly fired Schalen for engaging in "concerted activities for the purpose of ... mutual aid or protection"—activities protected by the NLRA. 29 U.S.C. §§ 157, 158(a)(1). The NLRB employs a two-step test to determine what constitutes protected concerted activity. First, an employee must engage in the activity "with or on the authority of other employees." *Meyers Indus. Inc.,* 268 N.L.R.B. 493, 497 (1984). Second, the employer must have reason to know of the concerted nature of the activity. *Id.* The NLRB has recognized that concerted activities include actions of individual employees which "seek to initiate or to induce or to prepare for group action" and actions which "bring truly group complaints to the attention of management." *Prill v. NLRB,* 835 F.2d 1481, 1484 (D.C.Cir. 1987) (quoting *Meyers Indus. Inc.,* 281 N.L.R.B. 882 (1986)).

■ None of these legal principles is in dispute. Instead, B & C claims the record does not support a finding that Schalen was engaged in concerted activity or that Schalen was fired because of protected activity. If this court owed no deference to the NLRB, the question whether Schalen was engaged in protected concerted activity might be a difficult one.

Schalen and the other waiters received a $70 gratuity for working a party for which they had anticipated payment of $106 each. The Board found that many of the employees were upset about the underpayment, that they discussed it and that they *planned* to speak to B & C management about it. Schalen testified that the Polls confronted him after his telephone conversation in which

he complained to his girlfriend and stated that he was going to take his complaint to the NLRB. Dean and Gillis Poll were seated at the bar, several feet from the telephone, at the time. When Gillis Poll asked Schalen who was upset about the payment, Schalen answered *"We* are very unhappy about it" (emphasis added). Schalen specifically denied, however, being the waiters' spokesman.

Schalen's denial that he was acting as a spokesman in his conversation with Gillis Poll supports the ALJ's determination that Schalen did not engage in concerted activity and that the Polls had no reason to suspect that he was engaged in such activity. Other evidence in the record, however, supports the Board's findings to the contrary. The fact that the Polls confronted Schalen immediately after his telephone conversation suggests that they overheard the conversation. The Board could have reasonably found therefore that the Polls heard Schalen announce his intention to go to the Board, itself a protected activity. *See, e.g., B & P Trucking,* 279 N.L.R.B. 693, 698 (1986); *Charles H. McCauley Assocs., Inc.,* 248 N.L.R.B. 346, 350 (1980). Moreover, Schalen told Gillis Poll that "we", presumably meaning he and the other waiters, were upset about the payment. Only when Poll pressed him did Schalen back away from that position. Thus the Board could have concluded that Schalen was in fact voicing a complaint on behalf of the group and that his subsequent denial was prompted by fear or by the impression that Poll was asking whether he was the *official* representative of the group (which he was not). The evidence supports the conclusion that Schalen in fact brought a group complaint to the attention of management and that management had reason to know of the group nature of the complaint. Accordingly, we believe that the record as a whole supports the Board's ruling that Schalen's discharge violated section 8(a)(1).

### B. Written Warnings to and Suspensions of Engelhardt

■ An employer commits an unfair labor practice by interfering with an employee's section 7 organizational rights[2] under the NLRA or by discriminating "in regard to ... any term or condition of employment to ... discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1), 158(a)(3). In general, conduct that discriminates with regard to terms or conditions of employment in violation of section 8(a)(3) also interferes with the employee's section 7 rights and thus violates section 8(a)(1). Moreover, an employer must have acted "to encourage or discourage membership in any labor organization," it must have acted in a discriminatory manner and its actions must have been taken with an anti-union animus. *Passaic Daily News v. NLRB,* 736 F.2d 1543, 1551 (D.C.Cir.1984). The Board may infer discrimination from both direct and circumstantial evidence, *NLRB v. Link–Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941). It generally considers such factors as the timing of the employer's actions, any disparity in the employer's treatment between union adherents and opponents and the employer's anti-union animus. *See Teamsters Local Union 171 v. NLRB,* 863 F.2d 946, 955 (D.C.Cir.1988); *Southwire Co. v. NLRB,* 820 F.2d 453, 461–63 (D.C.Cir. 1987). Enforcement of a valid work rule against union supporters in a disparately harsh manner violates the Act. *Southwire,* 820 F.2d at 464.

■ B & C argues that it did not violate sections 8(a)(3) and 8(a)(1) because, as the record shows, it disciplined Engelhardt for his misconduct. The record does contain some supporting evidence; for example, Engelhardt admitted remarking, albeit in jest, that he might spit in a customer's food. Likewise, Engelhardt did not deny smoking in the back room at the end of his shift and underreporting his tip income.

Nonetheless, the record also contains significant evidence to support the NLRB's findings. First, the ALJ noted that the increased disciplinary action and the changes

---

**2.** Section 7 of the NLRA gives employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157.

in work schedules began as soon as employees petitioned for an election. He also noted that Engelhardt, a union activist, received disparate disciplinary action. For example, other waiters and employees sat in the back room smoking with Engelhardt but only he was suspended. J.A. at 205–08. Other employees testified that the practice of smoking in the back room was routinely allowed even though B & C had a rule against it. Likewise, the ALJ found Engelhardt's second suspension for helping Ramirez pour a bottle of wine suspect for two reasons. First, B & C had a policy encouraging waiters to help one another. Second, although B & C maintains that the fact that Engelhardt and Ramirez and two other waiters were pooling their tips that evening supports a conclusion that the waiters were engaged in a systematic effort to disrupt its team assignments, B & C did not know of the agreement to pool tips when it suspended Engelhardt and Ramirez; nor did it ever take disciplinary action against the two other waiters. Moreover, B & C produced no evidence that pooling tips violated any of its rules. *See B & C Employee Handbook*, J.A. at 88–94.

Substantial evidence also existed that other B & C disciplinary actions were improperly motivated. Only Engelhardt was warned for underreporting tips despite the fact that it appeared to be a known general practice. The ALJ also credited Engelhardt's testimony that he was joking about spitting in a customer's food. We must accept "the ALJ's credibility determinations, as adopted by the Board, unless they are patently insupportable." *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C.Cir.1988). In light of the evidence, we uphold the Board's conclusion that the written warnings and suspensions Engelhardt received violated section 8(a)(1) and section 8(a)(3) of the Act.

## C. Changes in Ramirez's and Engelhardt's Work Schedules

■ B & C argues that it did not violate the Act when it changed the work schedules of Ramirez and Engelhardt after it received the petition for a union election. Because B & C resumed the original schedules immediately on Ramirez's and Engelhardt's com-

plaint, it claims it made a simple mistake that was not motivated by any desire to interfere with union activities. The ALJ, however, relying on the timing of the action, found that the action, an attempted change in employment conditions, was taken in retaliation for the two employees' union activities. The ALJ also noted B & C's failure to articulate a credible reason for the change. Although B & C claimed that the schedule change was a mistake, other testimony indicated that no other full time waiter ever took Friday and Saturday off since those nights were the most lucrative. There was no evidence that B & C did not need the usual number of waiters on those two nights. This testimony suggested that B & C routinely *expected* all full time waiters to work those nights; removing Engelhardt and Ramirez from those shifts thus appeared to be a planned change rather than an inadvertence. In addition, B & C provided no reason for breaking up Ramirez and Engelhardt as a team. In view of the evidence, we leave the NLRB's findings undisturbed.

## D. Constructive Discharge of Engelhardt

■ B & C next argues that the NLRB erred in concluding that it constructively discharged Engelhardt. "A constructive discharge occurs where an employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." *Katradis v. Dav-El of Wash.*, 846 F.2d 1482, 1485 (D.C.Cir.1988). B & C has no dispute with the applicable law. Instead, it claims that the record does not support the NLRB's finding of constructive discharge. Once again, the record contains evidence supporting B & C's challenge. For example, Engelhardt could name only one regular customer whom the Polls moved out of his section after the election. Similarly, Engelhardt conceded that he engaged in certain conduct, including smoking, coming to work late, and failing to tip bartenders. That conduct might have merited warnings or even suspensions had the discipline been imposed impartially.

Nevertheless, the record also includes evidence supporting the constructive discharge finding. First, Engelhardt's tips dropped off

significantly after the election.[3] Second, Engelhardt testified that management deliberately failed to seat customers in his section. Third, there existed the pattern of disparate disciplinary action already discussed. Fourth, the ALJ viewed Gillis Poll's statement to Engelhardt that he was costing Poll more money than he was worth as a threat. Given this evidence, the NLRB reasonably concluded that B & C created working conditions which led to Engelhardt's constructive discharge.

### E. Conversations with Ramirez

The ALJ found that conversations between Ramirez and the Polls created the impression of improper surveillance and thus violated section 8(a)(1). Generally, "management officials may observe public union activity, particularly where such activity occurs on company premises ... unless such officials do something out of the ordinary." *NLRB v. Southern Maryland Hosp. Center*, 916 F.2d 932, 938 (4th Cir.1990). Nonetheless, an employer may unlawfully create the impression of surveillance if it does something that interferes with, restrains or coerces the employee in the exercise of protected organizational activities. *Id.; see also UAW v. NLRB*, 455 F.2d 1357, 1367-68 (D.C.Cir.1971). We have previously held that interrogation of employees, when it interferes with or chills union activities, may create an impression of improper surveillance. *Road Sprinkler Fitters Local Union v. NLRB*, 681 F.2d 11, 19 (D.C.Cir.1982).

Here, the ALJ had substantial evidence to conclude that B & C created an impression of improper surveillance. B & C claims the conversations between the Polls and Ramirez were friendly, non-coercive discussions but their substance suggests otherwise. One conversation occurred before the election; two occurred in the weeks after the election. In the later conversations, the Polls tried to find out who had supported the Union. The conversations began with the Polls calling Ramirez away from work, suggesting that they were not unplanned office banter. In one conversation, James Poll indicated he was upset with Ramirez for his union activity. *See* J.A. at 156 (Ramirez's testimony that Poll said "I'm very upset with you ... [b]ecause you have been against me all this time with the people in the kitchen".) James Poll also accused Ramirez of organizing the "kitchen people" and attempted to discover the extent to which they had supported the Union. In another conversation, the Polls asked Ramirez who was "behind" the Union. Both conversations can thus be interpreted as an attempt to interfere with union activities.

### F. Gills Poll's Open Letter

We turn our attention to a troubling aspect of the NLRB's decision: its ruling on the open letter Gillis Poll sent to employees.

An open letter from management discussing the possible consequences of unionization can violate section 8(a)(1) unless the employer's predictions are "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). In addition, under section 8(c) of the Act, a management statement containing a "threat of reprisal or force or promise of benefit" can also violate section 8(a)(1). 29 U.S.C. § 158(c) ("expression of any views, argument, or opinion ... shall not ... be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit"). A prediction about the effects of unionization can rise to the level of a threat unless it is "carefully

---

**3.** As noted *supra,* Engelhardt testified that his tips decreased from $500 per week before the election to $300 per week after the election. B & C claims that joint exhibit 2, which the ALJ allegedly failed to consider, demonstrates that Engelhardt never earned $500 per week in tips and thus he suffered no significant decrease in income. The exhibit does indicate that Engel-

hardt earned $500 per week only occasionally. But it also reveals a substantial decrease in his income after his union activities began. In the twelve weeks before the employees petitioned for an election, Engelhardt earned on average about $413 per week in tips. In the nine weeks he was employed after the petition, he averaged approximately $123 per week.

phrased on the basis of objective fact." *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942.

The NLRB found that B & C's open letter contained predictions about the effects of unionization that had no basis in fact. The letter noted that "hundreds of restaurants in New York which were unionized [ ] have gone out of business" and that "a closing is inevitable" when business decreases in part due to unionization. It concluded that the letter contained a threat of closing in violation of section 8(a)(1).

■ We do not find in the NLRB precedent presented to us clear, uniform guidelines, in accord with *Gissel*, for employers to follow in drafting pre-election letters to employees. Whether a prediction is "carefully phrased on the basis of objective fact," we recognize, is a highly contextual matter. Nevertheless, it should be possible for the Board to supply more guidance than it has up to now. In any event, because we conclude that the issue is not properly before us, we do not resolve it. Because it determined that the letter contained a closing threat, the Board concluded that the letter necessitated a new election. It is well settled that the Board's direction of a new election is not a final order reviewable under either section 10(e) or section 10(f) of the NLRA. *See American Fed'n of Labor v. NLRB*, 308 U.S. 401, 409, 60 S.Ct. 300, 304, 84 L.Ed. 347 (1940); *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1310–11 (D.C.Cir.1984); *International Union of Elec., Radio & Mach. Workers v. NLRB*, 434 F.2d 473, 482 (D.C.Cir. 1970). Congress adopted this policy because it wished to avoid delays involved in direct judicial review—delays which ultimately could frustrate employees' bargaining rights before the employees had an opportunity to exercise them. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477–78, 84 S.Ct. 894, 896–97, 11 L.Ed.2d 849 (1964). If B & C wishes to challenge the new election, it can precipitate an unfair labor practice charge by refusing to recognize the union representation that could result from the election. *See Timsco, Inc. v. NLRB*, 819 F.2d 1173, 1175, 1177 (D.C.Cir.1987) (merits of employer's challenge to order for new election reached when challenge was brought after election);

*NLRB v. Carl Weissman & Sons, Inc.*, 849 F.2d 449, 450 (9th Cir.1988) (employer refused to bargain "to test its objections to a rerun election"). The second election was yet to be held at the time of oral argument. Accordingly, at this time we cannot review the NLRB's ordering of a new election based on B & C's open letter to its employees.

### G. Institution of Formal Disciplinary System

■ The ALJ found that B & C violated sections 8(a)(1) and 8(a)(3) by instituting a written warning system "directly as a result of the Union's petition." ALJ Opinion at 10. The ALJ relied heavily on the timing of B & C's action and its subsequent use of the disciplinary system against Engelhardt. The Board upheld the ALJ's findings and ordered B & C to desist from "instituting a formal written warning system because its employees engaged in activities on behalf of the Union."

We have previously held that, under certain circumstances, the initiation of a written system of discipline may violate sections 8(a)(1) and 8(a)(3). *McGraw–Edison Co. v. NLRB*, 533 F.2d 1266 (D.C.Cir.1976). In *McGraw–Edison*, the employer responded to a union organization campaign by initiating a policy of issuing written warnings "whenever necessary and whenever justified to keep people in their own departments" and thus to discourage union activity. *Id.* at 1268. Over the course of several months, the employer issued numerous warnings to union sympathizers and only one warning to an employee opposed to the union. *Id.* We upheld the Board's conclusion that the institution of the disciplinary system violated the NLRA. Nonetheless, we suggested that the Board's cease and desist order had to be narrowly tailored to allow the employer latitude to issue written warnings "for good cause unrelated to union activity." *Id.* at 1269 n. 8.

Other circuits have taken positions consistent with our ruling in *McGraw–Edison*. For example, the Seventh Circuit held that a new written system of discipline violated section 8(a)(3) because the employer adopted the system for retaliatory purposes, intending to use it to discourage union activity.

*Electri–Flex Co. v. NLRB*, 570 F.2d 1327, 1334–35 (7th Cir.1978).[4] Likewise, the Fourth Circuit concluded that a "new system of discipline violates the Act if implemented in retaliation for union activity." *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir.1991). The court noted that such a violation might occur "[e]ven where the new system does not change the standards of conduct." *Id.* In *Frigid Storage*, the employer attempted to justify its new disciplinary system by arguing that its purpose was solely to document employee misconduct. Nonetheless, the court upheld the Board's finding that the employer instituted the system for retaliatory purposes. It noted that the employer issued "sternly-worded written warnings" intended to chill the employees' freedom to organize. *Id.* The court also stressed that other unfair labor practices the employer had engaged in as well as the employer's clear anti-union animus supported the Board's finding that the institution of the system was retaliatory. *Id.*

At the same time, the NLRB has recognized that a non-retaliatory change in a system of discipline does not violate the NLRA. Thus, in *Breakfast Prods., Inc.*, 293 N.L.R.B. 607, 610 (1989), the employer established and maintained a procedure for recording disciplinary actions taken against employees after unfair labor practice charges were filed against it. Because it found no evidence that the procedure "was set up to discriminate against employees on the basis of their support for the Union," the Board concluded that the new system did not violate the NLRA. *Id.* The Board suggested that it might have found a violation if the system had not applied uniformly to all employees or if the company had instituted the system in order to discourage union support. *Id.*

Here B & C maintains that it instituted the written disciplinary system for record-

keeping purposes only and thus it did not violate the Act. While we agree with B & C that a change in the disciplinary system, if carried out for recordkeeping only, would not violate the NLRA, we believe that the ALJ had sufficient evidence to conclude that B & C's action was intended to discourage union activity. The ALJ relied both on B & C's disproportionate use of the system against union supporters and the timing of its implementation. These considerations are consistent with factors considered relevant in the past.

■ We note, however, that to the extent the ALJ based his holding on his conclusion that the system was instituted "in direct response to the Union's campaign," he was in error. J.A. at 10–11. In view of the Board's frequent reliance on the absence of written records as proof that treatment of an employee was discriminatory, *see, e.g.* J.A. at 5, a mere causal connection between unionization efforts and the institution of recordkeeping is not enough to establish unlawful intent. Otherwise, an employer would be placed in the position either of committing an unfair labor practice by instituting a disciplinary system or of rendering itself vulnerable to unfair labor practice charges relating to unrecorded or inconsistently recorded disciplinary actions.

■ Along these same lines, we are concerned that the NLRB's cease and desist order is too broad. The order requires B & C to refrain from "instituting a formal written warning system because its employees engaged in activities on behalf of the Union." NLRB opinion at 13. The order could be read to prohibit B & C from making future changes in its disciplinary system in a non-retaliatory fashion in order to keep better records for future NLRB proceedings or for

---

4. The Seventh Circuit found an illegal motive based on several factors. First, before the union election, the employer threatened to make it " 'rough' on union sympathizers" and stated that " 'things would be different' if the union came." *Electri–Flex*, 570 F.2d at 1334. Second, the company told employees that they were receiving written warnings because of the existence of the union. Third, the company failed to provide employees with notice of the new written warn-

ing system. Fourth, the court rejected the company's explanation that it instituted the written warning system to improve its recordkeeping because it anticipated future grievances, arbitration and even NLRB charges. *Id.* at 1335. The court did not conclude, however, that an employer's desire to keep better records standing alone could never justify the institution of a new disciplinary system.

grievance procedures. As we have noted, we believe our standard in *McGraw–Edison* does not so limit employer action. Accordingly, we direct the Board to amend its order to provide that the employer ceases and desists from:

(d) Instituting a formal written warning system in order to harass, intimidate or retaliate against employees engaged in union activities.

(e) Issuing specific warnings pursuant to a legitimate warning system in order to harass, intimidate or retaliate against employees engaged in union activities.

Therefore, we remand to the Board solely for it to amend its cease and desist order, consistently with our decision in *McGraw–Edison*, along the lines suggested above.

\*　　\*　　\*　　\*　　\*　　\*

Because the Board's new election order is not a final order subject to judicial review, we reach no conclusion regarding Gillis Poll's open letter to employees and whether it provided an adequate basis for the ordering of an election. We remand to the NLRB so that it can conform its cease and desist order regarding B & C's institution of a written disciplinary system to the holding in *McGraw–Edison* in light of this opinion. We enforce the Board's order in all other respects.

*It is so ordered.*