**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PERFORMANCE FRICTION CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,

No. 95-3151

UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS,
AFL-CIO, CLC,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

PERFORMANCE FRICTION CORPORATION,

Respondent,

No. 96-1096

UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS,
AFL-CIO, CLC,
Intervenor.

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-16040)

Argued: March 6, 1997

Decided: June 30, 1997

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and BLACK, Senior United States District Judge for the District of Maryland, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge Luttig wrote the opinion, in which Chief Judge Wilkinson and Senior Judge Black joined.

_____

**COUNSEL**

**ARGUED:** William Lawrence Rikard, Jr., PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina, for Petitioner. Robert James Englehart, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Marcia Weil Borowski, STANFORD, FAGAN & GIOLITO, Atlanta, Georgia, for Intervenor. **ON BRIEF:** Keith M. Weddington, Stacy K. Weinberg, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Stephen A. Yokich, INTERNATIONAL UNION, UAW, Washington, D.C., for Intervenor.

_____

**OPINION**

LUTTIG, Circuit Judge:

Petitioner Performance Friction Corporation appeals from the judgment and order of respondent National Labor Relations Board finding that petitioner violated sections 8(a)(1) and (a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1),(3), by instituting a new disciplinary system in order to discourage union activity and by discharging pro-union employees under that new system. For the reasons

2

stated herein, we affirm the Board's conclusions of violation, but remand for the Board to fashion a more narrowly tailored remedy.

I.

Performance Friction manufactures high-performance, non-asbestos automotive disk brake pads for major automotive manufacturers and for professional race car teams appearing in the Nascar Winston Cup and Indianapolis 500. J.A. at 859. Since 1986, when current owner and president Donald Burgoon acquired the company, Performance Friction's workforce has grown rapidly, from approximately 25 employees in 1986, to 100 employees in 1989, and to nearly 400 workers in 1994. J.A. at 731, 753, 859. Performance Friction attributes its growth to a commitment to quality which, according to former employee and union activist Susan Hudson, was almost fanatical, J.A. at 201; see also J.A. at 962. Over the course of this period of growth, Performance Friction's annual turnover rate has been high, the company discharging and replacing virtually its entire workforce annually. J.A. at 378, 881.

In November 1993, several months before union activity at the company began, Performance Friction put into place a new compensation plan designed to increase worker productivity. Under this plan, employees were assigned to one of seven pre-defined pay levels. From this pre-defined level, employees could advance by taking and passing, at their own pace, certain job-related tests, rather than await end-of-the-year evaluation. J.A. at 333-35, 452, 491-92. Shortly after this plan was instituted, Performance Friction's"scrap rate" (the monthly amount of scrap material as a percentage of total production, J.A. at 353-54), improved from 10.9% in December 1993 to 4.2% in April 1994, dropping to a low of 2.7% in October 1994. J.A. at 1055.

In early February 1994, the United Automobile, Aerospace, Agricultural Implement Workers of America (the "Union") began efforts to unionize Performance Friction's 400-member workforce. Burgoon, aided by Mike Ford, his assistant production manager and second-in-command of the company, opposed the Union through what it now concedes were unlawful labor practices.[1]

_____

[1] Performance Friction, for example, does not challenge that it illegally

threatened employees that it would be futile for them to select

3

Either shortly before or shortly after the unionization effort began, the company implemented a new and more strict disciplinary system which would make it easier for Performance Friction to discharge employees. J.A. at 864. Under the old disciplinary system, an employee would be suspended without pay for three days if he committed two major violations in 30 days, and would be discharged for a third violation within the 30-day period. J.A. at 864. The new system, which was designed to operate in tandem with the new pay level structure and advancement plan, eliminated the 3-day suspension and allowed Performance Friction to discipline employees for committing fewer violations over a longer period of time. Thus, an employee who committed either two major violations in 90 days or three major violations in six months would be demoted one pay level, or, if he was already at the lowest pay level, would be discharged. J.A. at 864.

It is not clear how many employees have been discharged under the new disciplinary system since its institution. However, Performance Friction had, between April 19, 1994, and the time this case was heard by the administrative law judge in December 1994, discharged a total of approximately 180 employees; and, according to its counsel, the company has now terminated over 300 employees total. J.A. at 1102-05; Petitioner's Reply Br. at 10 n.3. Among the first individuals discharged under the new disciplinary system were union activists Martha Hinson, Jerry Kennedy, Merrie Rowe, Hayward Steele, and Susan Hudson, and they were all discharged between April 19 and May 24 of 1994. J.A. at 1103. In addition, union supporter Manuel Mantecon was discharged on May 30 for not returning to work after having been on medical leave. J.A. at 1102.

In response to these discharges, the Union commenced this litigation on May 23, 1994, initially claiming only that the six union activ-

_____

the Union as their collective bargaining representative; impliedly threatened to reduce wages if employees selected the Union to represent them; interrogated employees about their union sympathies and activities, and the activities and sympathies of fellow employees; solicited grievances from employees and expressly or impliedly promised to remedy those grievances in order to discourage union activities among employees.

J.A. at 884, 915.

ists listed above had been illegally discharged. Later, however, after discovering that other employees also had been discharged under the new disciplinary system, the Union expanded its claims through a second amended complaint, which charged as follows:

> On or about 4-19-94, [Performance Friction] discriminatorily implemented a more [stringent] disciplinary policy in order to discourage support for, and activities on behalf of the union.

> Pursuant to this unlawfully implemented disciplinary policy, the employer discharged . . . [five of the six union activists (excluding Mantecon), as well as Kyle Meyers, Leslie Teague, Michael Thompson, Nedra Stewart, and Bernard Young.]

> The employer discharged [the six union activists] because of their membership in, and/or activities on behalf of the union.

J.A. at 926.

At trial, Performance Friction moved to dismiss the claims of Meyers, Teague, Thompson, Stewart, and Young, on the ground that the General Counsel presented no evidence at all regarding these individuals and, specifically, no evidence regarding their affiliation with or sympathy for the Union. J.A. at 308. The administrative law judge denied the motion, and, instead, permitted the General Counsel to expand the charge yet further, so as also to allege company violations against "all other unknown and unnamed people" discharged under the new disciplinary system. J.A. at 314, 904 n.1. At the conclusion of the hearing, the ALJ held for the General Counsel, finding, as modified by the Board, that Performance Friction had "instituted a new and more strict disciplinary system in response to employee union activity both to discourage such activity and to rid itself of Union activists," J.A. at 884, and that, pursuant to this system, the company had "discharged union activists and employees Martha Hinson, Merrie Rowe, Haywood Steele, Susan Hudson, Jerry Kennedy, Kyle Meyers, Bernard Young, Leslie Teague and others," in violation of sections 8(a)(1) and (3) of the National Labor Relations Act.[2] J.A. at

_____

**2** Sections 8(a)(1) and (3) of the National Labor Relations Act provide that

902. The ALJ and Board also found that the company had discharged Manuel Mantecon because of his union activities, in violation of the Act, albeit not under the new system. J.A. at 902. **3**

The Board ordered Performance Friction to "[c]ease and desist from . . . [i]nstituting a new and stricter disciplinary system in response to employee union activity to discourage such activity or to rid itself of union activists," J.A. at 903, and, in addition, to not only re-instate those named individuals as to whom the General Counsel presented proof of unlawful discrimination, but to re-instate, with backpay, <u>all</u> individuals who were discharged under the new disciplinary system. Thus, the Board ordered Performance Friction to take the following "affirmative action":

> (a) Rescind the new and stricter disciplinary system which was instituted by [Performance Friction] in response to employee union activity.

> (b) Rescind any disciplinary action taken pursuant to the stricter disciplinary system which system [Performance Friction] instituted in response to employee union activity.

_____

> (a) It shall be an unfair labor practice for an employer --

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

> * * *

> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(1),(3).

**3** The Board omitted Michael Thompson and Nedra Stewart because the record did not establish that they were discharged under the new disciplinary system. However, under the Board's order, the General Counsel would have the opportunity, in the compliance stage of the litigation, to establish that Thompson, Stewart, or any other employee, was discharged under the new system, and hence, illegally. J.A. at 902 n.2.

6

(c) Offer Manuel Mantecon, who was unlawfully discharged for engaging in union activities, and Martha Hinson, Merrie Rowe, Haywood Steele, Susan Hudson, Jerry Kennedy, Kyle Meyers, Bernard Young, Leslie Teague, and any other employee unlawfully discharged pursuant to the new disciplinary system, immediate and full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges; and to make them whole with backpay . . . plus appropriate interest, for any loss of earnings they may have suffered as a result of the discrimination against them.

J.A. at 903. As to the unnamed individuals, Performance Friction would have the opportunity, during the compliance phase of the litigation, to prove that they would have been discharged even under the old disciplinary system; otherwise, Performance Friction was required to re-instate them with backpay regardless of their union affiliation. J.A. at 885, 902 n.2.

On appeal, Performance Friction first argues that the Board's findings that Performance Friction instituted the new disciplinary system unlawfully and that it unlawfully discharged union activists under that system and because of their union activity are not supported by "substantial evidence." Performance Friction argues, second, that the Board's order, that Performance Friction rescind the new system and re-hire all employees discharged under it, is overbroad.

II.

Notwithstanding Performance Friction's arguments to the contrary, "substantial evidence," see McLean Trucking v. NLRB, 719 F.2d 1226, 1227 (4th Cir. 1983), supports the Board's conclusions that the company unlawfully implemented its new disciplinary system on April 19, 1994 -- shortly after the Union began organizing the company's workforce -- in order to discriminate against the Union and union adherents, see NLRB v. Frigid Storage, 934 F.2d 506, 510 (4th Cir. 1991) ("A new system for discipline violates the Act if implemented in retaliation for union activity."); see also Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1334 (7th Cir.), cert. denied, 439 U.S. 911

7

(1978), and that the company then proceeded to use that system to unlawfully discharge known union supporters Hinson, Kennedy, Rowe, Steele, and Hudson. The Board's conclusion that Performance Friction discharged Mantecon in violation of the National Labor Relations Act is likewise supported by substantial evidence.

Performance Friction's assertion that it implemented the new disciplinary system in November 1993 (before the arrival of the Union and therefore independent of any union activity), at the same time it implemented its new compensation system, is belied by considerable evidence. First, Mike Ford himself testified in sworn affidavit that the new disciplinary system had been implemented in April 1994. J.A. at 977. Although Ford later recanted that testimony at trial, J.A. at 72, we cannot say that the Board erred in crediting Ford's sworn affidavit over his eleventh hour recantation. Moreover, Ford's affidavit testimony was corroborated by the fact that, as the administrative law judge found, between November 1, 1993 and April 19, 1994, "[n]o fewer than 11 instances of discipline were issued . . . not only on forms used under the old system, but clearly utilizing the rules of the old system," J.A. at 868. For example, on January 19, 1994, an employee named Jerry Wright was charged with a "minor" violation for failing to properly complete quality paperwork, J.A. at 1360, even though under the new disciplinary system that violation would have been categorized as "major," J.A. at 964. Furthermore, prior to April 1994, the handbooks that Performance Friction distributed to new employees still included the rules for the old disciplinary system. J.A. at 161.

Substantial evidence also supports the Board's finding that Performance Friction used this new system to discourage union activity and thin its ranks of union activists by unlawfully discharging Hinson, Kennedy, Rowe, Steele, and Hudson. Performance Friction does not contest that, as to all of these individuals except Steele, it was fully aware of their pro-union sentiments. See Goldtex Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994) (describing "the most basic element of an unlawful discharge -- namely, that the employer [be] aware of the discharged employee's protected activities."); see also J.A. at 277-78, 364, 377, 797-99. And the Board could have inferred that Burgoon and Ford were aware that Steele, too, was pro-Union, from the fact that Steele's supervisor knew of his pro-union sentiments, J.A. at

8

88-91, and that Steele reported to the police that he had witnessed Burgoon and Ford nearly run over two Union activists with their truck, J.A. at 93. Moreover, all of these individuals were among the very first employees disciplined and discharged under the new system, and each of their discharges were for questionable violations of company policy. Hinson was discharged for violating the seldom-enforced rule of not wearing safety glasses. J.A. at 138. Rowe was discharged after missing work because she could not find a babysitter to care for her child, even though other employees were permitted to miss work under similar circumstances. J.A. at 284-85. Hudson was disciplined for making a defective product, even though she had earlier been commended for spotting the defect in that very product, and notwithstanding the fact that she was operating a malfunctioning machine. J.A. at 182-84. Steele, who was discharged just one week after reporting the truck incident to the police, J.A. at 94, was cited for completing faulty paperwork; however, unlike with past instances, Steele's supervisor refused to show him the alleged errors. J.A. at 101-02. Finally, although the evidence against Kennedy was the weakest, even there, Kennedy was issued a violation for missing Saturday work where he himself did not actually sign up for it, but, rather, was signed up for it by his supervisor. J.A. at 593-94.

Similarly, although Mantecon was not discharged under the new disciplinary system, substantial evidence supports the Board's conclusion that he, too, was fired in retaliation for his pro-Union activities. As with the others, Performance Friction was aware that Mantecon was actively pro-Union, J.A. at 798, and it discharged him under suspicious circumstances. When Mantecon returned to work after an authorized sick leave, the company told him that he had been discharged over three weeks earlier on May 4, 1994, J.A. at 251, even though his authorized period of convalescence did not end until May 18, J.A. at 969, and notwithstanding the fact that several company documents indicate that he was discharged on May 30, J.A. at 965, 1102.

We therefore affirm the Board's findings that Performance Friction implemented the new disciplinary system in order to discourage union activity and rid itself of union activists, and that the company then proceeded to discharge certain known union activists pursuant to that system and/or in retaliation for their pro-union activities.

9

III.

Although the Board did not err in determining that Performance Friction violated sections 8(a)(1) and (a)(3) of the Act, we believe the Board did exceed its remedial authority when it ordered Performance Friction to cease and desist from enforcing, and actually rescind, the new disciplinary system, and to reinstate with backpay all employees who had been discharged under that system, whether or not anti-union animus underlay their discharges.

Although the Board's remedial power is broad, encompassing the power to order "such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act, 29 U.S.C. § 160(c); see also NLRB v. Williams Enterprises, 50 F.3d 1280, 1289 (4th Cir. 1995), that broad authority is not without "limitations." See, e.g., Ultrasystems Western Constructors v. NLRB, 18 F.3d 251, 258 (4th Cir. 1994); cf. Sure-Tan Inc. v. NLRB, 467 U.S. 883, 900 (1984). Among those limitations, an "order . . . must . . . be congruent with the scope of discrimination, so that its enforcement neutralizes the discrimination, and does not go beyond." Ultrasystems, 18 F.3d at 259.

Here, the Board's order that the company permanently rescind its disciplinary policy and rehire all employees discharged under that policy exceeds the scope of the Board's remedial authority. That an employer may have instituted a broad business plan out of anti-union animus simply does not ipso facto establish that the enforcement of the provisions of that plan thereafter constitutes anti-union discrimination. In other words, it does not follow from the fact that a company adopts a particular policy out of impermissible motives, that its application of that policy in all instances will have the impermissible discriminatory effects reached by the Act. This is to say, of course, no more than that a policy or plan may be instituted for prohibited reasons (and therefore run afoul of the Act's proscriptions) yet be both facially neutral and enforced nondiscriminatorily.

Accordingly, an order like that entered by the Board in this case, which essentially presumes discrimination by the company in its discharges under a facially neutral business plan, exceeds even the Board's concededly broad remedial authority. It is only slight hyper-

10

bole that such an order is the equivalent of a hostile government takeover of a company through administrative agency regulation. Were we to place our imprimatur on such an order, we would in effect be acquiescing in the Board's substitution of its own "business judgment" for the employer's legitimate business judgment, in contravention of our established precedent that, "[w]here . . . there is no evidence that the company discharged particular employees in order to discourage union membership or activities, the company is entitled to its own assessment of an employee's worth, an assessment which must be respected by the Board." Goldtex Inc. , 14 F.3d at 1012; see also NLRB v. Wright-Line, 662 F.2d 899, 903 (1st Cir.), cert. denied, 455 U.S. 989 (1982) (warning against restricting an"employer's freedom to apply legitimate performance standards").

Indeed, this case is paradigmatic of the perniciousness of such an overly broad remedial order. There is absolutely no evidence that any individual other than the five known Union activists discharged under the new disciplinary system, was so discharged because of his union affiliation or sympathies. The evidence does not even reveal whether the unknown individuals whom the Board has ordered the company to rehire were pro-Union, ambivalent towards the Union, or ardent opponents of the Union. Yet, the Board order requires Performance Friction not only to rehire with backpay all of these identified and unidentified individuals, but also to rescind the company's entire personnel disciplinary system, a system which the Board does not even suggest facially discriminates against pro-union employees, and as to which no finding of discriminatory application has been made beyond the five individual instances which occurred in the one-month period. The folly of such an order is borne out by the NLRB counsel's acknowledgment at argument that Performance Friction could rescind its "unlawful" disciplinary policy on one day and lawfully re-implement the exact same plan the next day, provided that the company satisfies the Board that it has been purged of its malevolence toward the union.

In recognizing that the Board exceeds the outer limits of its authority when issuing orders of the type at issue here, we are not alone among our sister circuits. In two cases directly analogous to the case sub judice, for example, the District of Columbia Circuit similarly vacated the Board's remedial orders and remanded with instructions

11

to tailor the orders more narrowly so as not to prohibit lawful employer activity. See McGraw-Edison Co. v. NLRB, 533 F.2d 1266, 1268-69 (D.C. Cir. 1976); Gold Coast Restaurant v. NLRB, 995 F.2d 257, 268-69 (D.C. Cir. 1993). In those cases, the Board concluded, and the court affirmed, that the companies had unlawfully instituted disciplinary and warning systems in order to discriminate against the unions, see 533 F.2d at 1268; 995 F.2d at 267-68, just as we have concluded here that substantial evidence supports the Board's conclusion that Performance Friction instituted its disciplinary system in order to discriminate against the Union. In each of these cases, the District of Columbia Circuit held that the Board's remedies -- which required the companies inter alia to cease and desist from "[o]rdering supervisors to issue written warnings to employees suspected of engaging in union activities," 533 F.2d at 1266-67 n.1, and "instituting a formal written warning system because its employees engaged in activities on behalf of the Union," 995 F.2d at 268 -- were overbroad because they "[caught] within [their] sweep not only prohibited conduct such as that which formed the basis for the finding of unfair labor practices here, but a number of otherwise valid management practices." 533 F.2d at 1268. As a consequence of the overbreadth of the Board's orders, the court reasoned, the employers would have been prevented "from making future changes in[their] disciplinary system[s] in a non-retaliatory fashion," 995 F.2d at 268, and "prohibit[ed] [from issuing] written warning[s] and [taking] numerous other supervisory actions which have no relation to union activity," see 533 F.2d at 1269.

In both McGraw-Edison and Gold Coast Restaurant, the court required the Board to amend its orders in precisely the way that we require the Board to modify its orders herein. The court required the Board to refashion its orders so that the employers could take any of the actions prohibited by the Board's original orders, provided that the actions were taken for legitimate business purposes unrelated to the employees' union activities; that is, so that the orders "recognize[d] the area in which the company [could] properly operate" free from agency interference. See McGraw-Edison, 533 F.2d at 1269.

Thus, in McGraw-Edison, the court required the Board to modify its order that the employer cease and desist from"[o]rdering supervisors to issue written warnings to employees suspected of engaging in

12

union activities," <u>so as to include an exception "for good cause unrelated to union activity"</u>; its order to cease and desist from "[m]aintaining surveillance over employees suspected of engaging in union activities," <u>so as to include the same exception</u>; its order to cease and desist from "[i]ssuing permanent written warnings, contrary to past plant practice, to union sympathizers when suspected of engaging in union activities," <u>so as to allow the company to "change its practice[s] . . . upon proper notice and for reasons unrelated to union activity"</u>; its order to cease and desist from "[o]therwise threatening union sympathizers with discharge for engaging in union activities," <u>so as not to prevent the company from</u>"threaten[ing] [employees] with or actually discharg[ing] [them] for good cause unrelated to union activity"</u>; and, most significantly for purposes of the case before us, its order to cease and desist from "[t]ightening up enforcement of plant rules in order to discourage union activities among its employees," <u>so as to respect the company's right to "tighten up" enforcement of plant rules "for reasons unrelated to union activity." See</u> 533 F.2d at 1269 n.8.

In <u>Gold Coast Restaurant</u>, the court similarly directed the Board to modify its order restraining the employer from "instituting a formal written warning system because its employees engaged in activities on behalf of the Union," <u>so as only to prohibit the employer from instituting such a warning system "in order to harass, intimidate or retaliate against employees engaged in union activities"</u>, and its order to cease and desist from "issuing written warnings to its employees pursuant to the written warning system," <u>so as only to prohibit the employer from issuing such warnings "in order to harass, intimidate or retaliate against employees engaged in union activities." See</u> 995 F.2d at 263, 267, 269.

In accord with these authorities, and for the reasons explained, we likewise vacate the Board's remedial order in this case and remand with directions to the Board to modify its order against Performance Friction so as to permit the company to retain in effect its disciplinary policy implemented on April 19, 1994, unless substantial evidence develops that that policy is being enforced in a manner discriminatory toward the Union or the company's pro-union employees. Additionally, the Board's revised order should not require the company to reinstate with backpay, Kyle Meyers, Bernard Young, Leslie Teague,

13

Michael Thompson, and Nedra Stewart, or any other employee except those discussed in Part II <u>supra</u>, until such time as it is proven that their discharges were the consequence of their pro-Union affiliation or sentiments.

The judgment of the Board is affirmed in part and reversed in part, and the case is remanded with instructions to fashion a remedial order consistent with this opinion and with the powers conferred upon the Board.

<u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED</u>

14